# Richmond

## THE CITY OF COLONIAL HEIGHTS, VIRGINIA, ET AL. V. THE COUNTY OF CHESTERFIELD, VIRGINIA, ET AL.

June 21, 1954.

Record No. 4180.

Present, All the Justices.

The opinion states the case.

*Harry L. Snead* and *Harry L. Snead, Jr.*, for the appellants.

*John W. Pearsall, William H. King* and *McGuire, Eggleston, Bocock & Woods*, for the appellees.

SPRATLEY, J., delivered the opinion of the court.

The object of this proceeding is to obtain an adjustment of the financial obligations of the City of Colonial Heights to the County of Chesterfield, arising out of the transition of the Town of Colonial Heights to a city of the second class. The determination of the questions involved is dependent upon the construction of sections 15-101, 15-102, and 15-103 of Title 15, Chapter 6, Code of 1950, entitled "Transition of Towns to Cities," hereinafter referred to as the transition statute. This statute apparently had its origin in 1916, (Acts of Assembly, 1916, Chapter 159, pages 314, *et seq.*) and except for minor changes in 1918, (Acts of Assembly, 1918, Chapter 368, page 557) has not been amended.

The suit was instituted by the County of Chesterfield, hereinafter called the County, and the Board of Supervisors of the County of Chesterfield, hereinafter called the Board of Supervisors, against the City of Colonial Heights, hereinafter called the City, and the Council of the City of Colonial Heights, hereinafter called the City Council, the School Board of the City of Colonial Heights, hereinafter called the City School Board, the School Board of Chesterfield County, hereinafter called the County School Board, and J. William Dance, Treasurer of the County of Chesterfield. An answer and cross-bill was filed by the City and City Council. The City School Board, the County School Board, and Dance answered, praying that their interests be protected by the court. The County and the Board of Supervisors filed an answer to the cross-bill.

An agreed statement of certain facts was filed, other

undisputed evidence presented, and briefs tendered. On December 13, 1952, after a consideration of the evidence and the briefs, the learned chancellor of the trial court, at the request of the parties, entered a decree adjudicating the principles of the cause, in accordance with his written opinion therewith filed.

The stipulation of facts and evidence presented and considered may be summarized as follows:

The Town of Colonial Heights, hereinafter referred to as the Town, was incorporated as such in 1926. Its original area, and additional areas subsequently obtained in three annexation proceedings, were formerly portions of the County of Chesterfield.

The Town became a city of the second class on March 19, 1948, pursuant to the provisions of Chapter 6 of Title 15, Code of Virginia, 1950, section 15-78, *et seq.*

The territory of the Town constituted the major portion of Matoaca Magisterial District. Its assessed taxable values constituted 59.74% of the assessed taxable values of the whole of that district.

In 1921, the School Board of Matoaca District constructed and furnished an elementary school within the area which afterwards was incorporated as the Town of Colonial Heights. Two additions to the school were subsequently made, the last one in 1937. The cost of the original building amounting to $40,000 was paid by the taxpayers of Matoaca District, including those who resided in the area now known as Colonial Heights. The cost of additions, in the amount of $25,000, was paid by the County as a whole, including the Town. As of 1948, this school property was valued at $110,000, and its equipment at $9,800. There is no high school or other elementary school in Colonial Heights.

On August 10, 1922, pursuant to Code § 22-42, Acts of 1922, page 737, which abolished magisterial school districts, the School Board of Matoaca District conveyed all school property in that district to the County School Board of

Chesterfield County. Since that date, legal title to the school in Colonial Heights has been in the County School Board. The great majority of the high school pupils residing in Colonial Heights have attended a high school in the City of Petersburg, a city which adjoins the boundaries of Colonial Heights. The tuition of these high school pupils, prior to the date of the transition of the Town to a City, was paid by the County School Board. Though the Town did not constitute a separate school district, it had, as permitted by § 22-43, a representative on the County School Board.

Prior to 1922, indebtedness for school construction was the obligation of a school district, the magisterial district being the basic school district unit. *County of Brunswick* v. *Peebles, etc. Co.*, 138 Va. 348, 122 S. E.. 424. The County now constitutes a unit for all school purposes, taxation, management, control and operation, and the school affairs of each county are managed as if the County constituted but one school district. § 22-42 Code of 1950. The construction and operation of schools are now responsibilities of the County as a whole. However, magisterial school districts continue in existence for the purpose of liquidating indebtedness on district schools incurred by them prior to 1942.

On March 19, 1948, there was no debt owed for the construction of any public school building in Colonial Heights or Matoaca District. The existing indebtedness of the County on that date was $1,257,124, wholly on account of schools. Of this amount $1,008,162 was incurred by contracts for construction entered into in 1947. Some of this construction work was, on March 19, 1948, still in progress. This debt was evidenced by notes for temporary loans obtained with the approval of the State Board of Education. The remaining indebtedness consisted of school bonds dated March 1, 1948, in the amount of $103,962, issued in retirement of temporary loan notes in the amount of $145,000, obtained in 1941. The above sums appear to

represent indebtedness for schools, none of which was within Colonial Heights or Matoaca District.

A large portion of the total indebtedness was refunded in 1948, subsequent to the transition of the Town to a City, after a referendum by the voters of Chesterfield County, not including the City, in the aggregate amount of $1,153,162, retiring the temporary loans.

The assessed value of real and personal property of Chesterfield County, before the formation of the City, was $39,655,149, and the assessed value of property in the City, after its formation, was $4,811,140. Such property in the City, therefore, represented 12.13% of the values in the County and City.

The county treasurer maintained several accounts for funds, the several balances in which were on March 19, 1948, as follows: General Fund, approximately $148,716; County Road Fund $15,057.55; Public Assistance Fund $2,513.84; Dog Tax Fund $10,946; and County School Fund $26,656.

It was stipulated that:

"The County receipts, from day to day, from the sale of business and hunting licenses, from sheriff's, Commonwealth attorney's, police officers' and trial justice's fees, from interest on government bonds, from real and personal property and rolling stock taxes, both current and delinquent, from land redemptions, from the County's share of State ABC profits and wine taxes, from State refund of capitation, gasoline and motor carriers taxes and of excess Court Clerks fees, from State public assistance grants, and from telephone refunds and other miscellaneous sources, are deposited in the General Fund. From the General Fund the Treasurer, pursuant to budgetary appropriation by the Board of Supervisors, from time to time transfers to the Public Assistance Fund sufficient amounts, when added to the periodic remittances of State and Federal money, to cover expected current operational requirements of the Department of Public Welfare, and to the School Fund sufficient amounts,

when added to the periodic remittances of State and Federal money, to cover the expected current operational requirements of the schools.

"The Dog Tax Fund is derived from the sales of dog licenses.

"The Virginia Public Assistance Fund is derived from transfers from the General Fund, supplementing the periodic remittances of State and Federal money.

"The County Road Fund is an aggregation of accumulated balances from discontinued district levies for roads, from which occasional appropriations have been made for respective magisterial district purposes.

"The School Fund is derived from State school aid grants, Federal school lunch money and transfers from the General Fund.

"The County continued to operate the elementary school and to furnish the facilities of the Circuit Court, together with those of the Commonwealth Attorney's office, the Sheriff's office and the Clerk's office, and the services of the Public Health and Public Welfare departments and of the Game Warden, all upon an agreed basis of reimbursement, except for the period from the date of transition, March 19, 1948 to the end of the County's fiscal year, June 30, 1948. The City's share of these costs and of the costs of street lighting for this period was $14,249.53. The parties have submitted to the Court for its equitable determination in this proceeding whether the City was entitled to such services for this period without payment.

"Unless the City acquired the building and equipment of the elementary school in Colonial Heights by operation of the Transition Statute, the parties have also submitted to the Court for its equitable determination in this proceeding what payment should be made by Colonial Heights because of the circumstance of its use thereof since the date of transition, the County School Board thereby agreeing to execute such instruments as might be required by the Court's determination.

"The total of 287/366ths of the 1948 taxes, the delinquent taxes on property in Colonial Heights collected after the date of transition, 12.13% of the balance in the General, Public Assistance and County Road Fund, and 12.13% of the value of all school property in Chesterfield County exceeds the total of 12.13% of the existing County indebtedness and the value of the Colonial Heights School and equipment."

"Upon information supplied by the County treasurer it was further stipulated at bar that business license receipts are based on estimated volume of licensee's business, hunting and fishing licenses are based on flat fees, sheriff's fees are remitted monthly; Commonwealth attorney's fees are remitted monthly through the Clerk; Trial Justice and Police Officers' fees are remitted monthly by the Trial Justice Court, delinquent land collections after two years are remitted by the Clerk, ABC funds are remitted on a per capita basis, capitation tax refunds are remitted on a per capita basis, school operating funds are remitted by the State on a daily attendance ratio basis, gas tax refunds are determined by gas consumption by County vehicles, and State public assistance grants are determined by the State and Federal government's participation in the aggregate individual grants made by the Welfare Department."

The fiscal years of the County and City run from July 1st of each year to June 30th of the succeeding year. The levy of taxes is made for the calendar year, the taxes being due and payable in December. After March 19, 1948, the county treasurer continued to collect taxes for 1948 and prior years on property situated in the City.

Taxes collected from assessments made upon property within the City for 1948, and held in a cash account with the City, amounted to $75,596.56, according to the county treasurer, of which 78.63% is $59,439.77. The total value of all school buildings in the County and the school in Colonial Heights and all the school equipment in those build-

ings amounted to $2,876,800, including the Colonial Heights school building and the equipment therein.

The accuracy of the figures stated is not in issue. The record is made up for the sole purpose of obtaining an adjudication as to the rights of the respective parties.

The law involved is contained in the following sections of Code of Virginia, 1950:

"§ 15-101. State, county and district levies.—All State, county and district levies on property within the territory occupied by the city that accrued before the city became such shall be payable to and collected by the county treasurer and the proceeds of all county and district levies on property within the city shall be held by the county treasurer subject to the rights of the city to be adjusted in the manner hereinafter provided. (Code 1919, § 2901.)"

"§ 15-102. Assumption of debt; adjustment.—Whenever a town hereafter becomes a city, as herein provided, the city shall assume and provide for the reimbursement of the county of a just and reasonable proportion of any debt of the county existing at the date the town becomes a city and also for compensation to any school district of which the town was a part for the city's just and reasonable proportion of any debt existing on the district at such date.

"The common council of the city and the board of supervisors, in the one case, and the council and the district school trustees, in the other case, shall make an equitable adjustment of such debts, and the same shall be provided for as those bodies shall determine and agree upon. In making such adjustment the parties shall take into consideration the city's just proportion of money collected by the county treasurer under the preceding section and of any unexpended balance in the county treasury belonging to any fund to which the territory embraced in the city has contributed and shall take into consideration all other equitable claims of the city, county and district. (Code 1919, § 2902.)"

"§ 15-103. When claims can not be adjusted between council and the boards.—In the event of the failure of the

parties aforesaid to make such adjustment and to agree upon such terms either party may proceed against the other by a bill in equity in the circuit court of the county in which the city lies for a proper adjustment of such matter. (Code 1919, § 2903.)"

By decree entered December 13, 1952, the chancellor of the trial court held that §§ 15-101 and 15-102 applied to the pertinent facts, and required:

(1) That the City assume 12.13% of the indebtedness of the County existing on March 19, 1948, the ratio which the assessed value of property within the City bore to that of the County as a whole, including the territory within the City, hereinafter sometimes referred to as the "ratio of assessed values."

(2) That there be credited on said debt assumption by the City the following items: 287/366ths, that is, 78.63% of the 1948 taxes on property within the City collected by the County treasurer, that being the ratio which the number of days in 1948, subsequent to the transition, bore to the number of days in that year; all delinquent taxes collected on property in the City after the date of transition; 12.13% of the unexpended balances in the General, Public Assistance, and County Road Funds; and such proportion of the balance in the Dog Tax Fund as payments made to that fund by residents of the City bore to payments made by residents of the County as a whole.

(3) That the City be entitled to the credit of a part of the County School Fund; but since the court was not certain "as to the relative contributions of the State, Federal and County Governments" to that fund, it was unable to determine a proper division;

(4) That in the consideration of "all other equitable claims" of the City, there be further credited on its debt assumption 12.13% of the value of all school buildings and equipment in the County as a whole.

(5) That the ultimate disposition of the elementary school in the City having been submitted to the court by consent

of all parties, and as the court was of opinion that the claim of the County to the school was embraced within the classification of "all other equitable claims" of the County, the County School Board should convey all of its right, title and interest to said school building and equipment to the City School Board at their fair value; that the amount of such fair value be added to its claim for debt assumption; and the credits to the City hereinbefore indicated be offset against the combined claims of the County.

The court was of opinion that the City should pay the County $14,249.53 for services rendered by the County to the City from the date of transition to June 30, 1948, according to an agreement between them; which sum was not to be used to offset any claim of the County against the City, as the responsibility therefor arose after and independently of the transition.

The court was of further opinion that since it appeared from the stipulation of counsel, the total of the credits allowed to the City under paragraphs two and four above, exceeded the sum of the debt assumption, plus the fair value of the elementary school claimed by the county, it was not necessary to present further evidence to ascertain the exact dollar amount of such credits, or the value of the said school and its equipment, as all of the claims of the County assertible under the statute are completely offset.

The court then accordingly decreed:

"That Colonial Heights be relieved of any obligation to assume any of the debt of the County, that the County School Board convey without consideration to the City School Board all right, title and interest in the County elementary school building and equipment located in Colonial Heights, that the County not pay to Colonial Heights any of the funds derived from taxes for the year 1948 in Colonial Heights nor from any delinquent taxes, nor any part of the fund balances in the County Treasury on March 19, 1948, and that Colonial Heights pay to the County $14,249.53 for services rendered in the interim between the

date of transition and the commencement of payment for services.

"And it further appearing that by certain orders heretofore entered on May 12, 1949, and January 19, 1950, all without prejudice to the claims or positions of any party, the City has received certain amounts representing its portion of the 1948 taxes, namely $10,561.19, as a direct payment and $43,633.46 as credits on certain subsequent and independent obligations to the County, and the City being not entitled under the statute both to the actual receipt of such portion and to a credit for the same on and in lieu of its debt assumption, it is Adjudged, Ordered and Decreed that Colonial Heights repay to the County $54,194.67."

There are numerous assignments of error and cross-error, which we shall undertake to cover in our consideration of the principal issues.

There is nothing in the Constitution or statutes of Virginia which aids us in the construction of Code, §§ 15-101 and 15-102, the two sections here primarily involved. Although there have been a number of transitions from towns to cities, since the enactment of the transition statute, thirty-eight years ago, this is the first time we have been called upon to construe it.

The decisions in cases involving our annexation statute, Code, § 15-125, et seq., aid us only where the language of that statute is similar to the language of the transition statute in connection with corresponding facts and circumstances. Nor are cases from other States helpful where the relation between counties, cities and towns differs from that in Virginia. The legislature of this State has provided in §§ 15-101 and 15-102 a formula dealing with the liabilities arising from the transition of a town to a city of the second class. In our consideration of those two sections, we must be guided by the language used and the meaning its words have in ordinary use and acceptance.

Counties, cities and towns are subdivisions of the State, subject to legislative control as to their powers, forms of

organization and government. Constitution of Virginia, Articles VII and VIII. "The General Assembly shall provide by general laws for the extension and the contraction, from time to time, of the corporate limits of cities and towns; * * *." Constitution of Va. § 126. In the event of a territorial change or political classification, the General Assembly, within constitutional limits, may provide for a transfer or apportionment of the debts or assets of the subdivisions involved in such manner as may seem to it reasonable and equitable. 20 C. J. S., Counties, § 35 b, page 784; 14 Am. Jur., Counties, § 13, page 192.

A transition proceeding is more like a partition of territorial area than an annexation. As a part of a county, a town makes financial contributions towards the creation of public assets in the whole county. In return, it receives certain services and benefits from the county, governmental and ministerial. The town, upon becoming a city, separates from a political subdivision of which it was a part and becomes an independent political subdivision, except as to certain joint services specified in Code, § 15-104. Thereafter both county and city have fiscal independence, except for the possible debt assumption by the city of a just and reasonable proportion of any existing debt of the county. The property of the *town* is specifically transferred to the new city, and the latter becomes liable for the debts and obligations of the town, § 15-84.

In annexation and transition proceedings the effect upon the county is the same with respect to reduction of its taxable values. In both the requirements of debt assumption are to offset the reduction in the ability of the county to pay its obligations incurred on the basis of its taxable values. *Henrico* v. *City of Richmond,* 177 Va. 754, 803, 15 S. E. (2d) 309.

Because of the variety of local conditions which may exist in transition, it is almost impossible to prescribe a fixed formula of debt adjustment in every case. The facts and circumstances in any particular case may vary and differ

materially from the facts of another case. There may be instances where the larger portion of the public property of a county is located within the boundaries of the new city, or the debt of the county has been incurred for improvements within the city. In other cases, the great body of public property and public improvements for which the county is liable may be left without the boundaries of the new city, and the more valuable land and property subject to taxation may be within one or the other. Any hard and fast rule might result in an unfair adjustment between the two political subdivisions.

The application of § 15-101 presents no great difficulty. It authorizes the county treasurer to collect "*All* State, county and district levies on property within the territory" occupied by the city that accrued before the city became such. The word "all" is most comprehensive. It includes taxes levied for the year in which the transition occurred, as well as delinquent taxes for prior years. Taxes paid before transition have gone into the county treasury, and are reflected in the unexpended fund balances in that treasury. The time of the payment of delinquent taxes, if made, is uncertain and their value incapable of definite appraisal. The right to them is determined as of the time of payment, and not as of the time of accrual. *School Board* v. *County School Board*, 189 Va. 211, 218, 52 S. E. (2d) 122. "All county and district levies on property within the city," collected by the county treasurer are required to be held by him, "subject to the rights of the city to be adjusted in the manner provided" in § 15-102.

The application of the provisions of § 15-102 presents more difficulty. Its language is broad and general. It vests a large discretion in the governmental bodies of the county and city in adjusting the specified items, and upon their failure to reach an agreement vests the same power in the courts. It does not prescribe a fixed formula for debt adjustment; but there is no ambiguity of purpose expressed, if consideration be given to the words "just and reasonable,"

"equitable adjustment," and "equitable claims." Equity and justice, that which is just, fair and right in the view of a fair minded man, are the standards provided.

■ Under the first paragraph of § 15-102, the city is required to assume a "just and reasonable proportion of any debt of the county," existing at the date of transition. "Any debt" includes the existing debt of any school district of which the city was a part, whether that district constitutes a part or the whole of the county. Since the enactment of § 22-42, the county, as a unit, constitutes a school district within the meaning of § 15-102, and the school debt of $1,257,124 is a debt of the County. *Henrico* v. *City of Richmond, supra,* 177 Va. page 802.

The fact that a debt has been incurred, in part, by the cost of constructing school buildings outside the territory of a city, or buildings to accommodate Negro pupils, when none resides in the city, is immaterial. It is for a county school board to determine the location and use of school buildings. Here, that portion of the debt which was incurred prior to March 19, 1948, for completing projects already contracted for is an existing debt within the meaning of § 15-102. *Henrico* v. *City of Richmond, supra,* 177 Va. page 803.

The subsequent refunding of temporary loans by bonds, issued after a referendum confined to the voters of a county, does not change the liability which a county has already incurred. In other words, a debt evidenced by temporary loans is an existing debt.

The debt of the County of Chesterfield was incurred on behalf of the County as a whole, on the basis of its taxable values. All of the taxable property within the County, including that in the Town of Colonial Heights, was subject to tax levies for its payment. Taxable values being the source for payment of the debt, the City should be required to assume such proportion thereof as the assessed values of property within the City, at the time of transition, bore to that in the County as a whole. *Henrico* v. *City of Rich-*

*mond, supra,* page 801. Here the *pro rata* share of the City is shown to be 12.13%

The second paragraph of § 15-102 relates wholly to the adjustment of existing debts of a county, taking into consideration the city's "just proportion" of taxes collected by the county treasurer and of any unexpended balance in the county treasury belonging to any fund to which the city has contributed, and "all other equitable claims of the city, county and district." It does not require a settlement between a county and a city in the nature of a general accounting. It is plainly intended to provide that, in making the debt adjustment required under the first paragraph of this section, the rights of a city to its just proportion of "money collected" by the county treasurer and of the unexpended balances specified, together with its equitable claims, shall be considered, and, where allowed, be used as a credit applicable only on the debt to be assumed by the city. In this connection, also must be considered the equitable claims of the county and district, if any. The rights and claims of both city and county are to be considered only in relation to a debt adjustment and no further. There is no provision, express or implied, which allows a recovery against the county for the excess of the allowable credits of the city beyond the amount of its just and reasonable proportion of the county's debt. This is the price which it must pay when it separates from a county.

Since a county bears all the expenses of operations before a transition and a city bears the cost of its operation after transition, it seems clear that the "city's just proportion of money collected by the county treasurer" in the year of transition should be determined by the time ratio which their respective periods of tax contribution bear to the number of days of the year in which the transition occurs. Here that ratio is 287/366ths or 78.63% for the City and 21.37% for the County. The fact that both the City and County had a budgetary period differing from the tax period is immaterial. The fixing of a budgetary period is a matter of

convenience in the administration of fiscal affairs; whereas a tax levy relates to the obligation of the taxpayer for a calendar year.

It is conceded that the City has contributed to the General, Public Assistance, County Road, Dog Tax and School Tax Funds. It is not denied that, to the extent of its identifiable contribution to such funds, the City has an equitable claim in the unexpended balances therein. The County contends that the contribution of the City is not traceable, and, therefore, its proper share cannot be determined except by speculation.

The General Fund of the County was an accounting device. It was made up, as shown in the stipulation of facts, by receipts from the sale of business licenses, hunting licenses, fees of officers, remittances from the trial justice, taxes collected, interest on investments, State A. B. C. profits, capitation taxes, State and Federal grants to schools and welfare agencies, and from other miscellaneous sources. The bulk of the fund was derived from real estate taxes.

In practice, all taxes and payments to the County, of every nature, were collected and first credited to its General Fund. The monies were used to finance the current operations of the county, or transferred to special accounts for specific purposes. Necessarily the exchange transferred funds to which the City had contributed to other funds where the same situation existed.

There is naturally a wide fluctuation in the balance of such a fund from time to time as collections are had, and payments and distributions made. There are many factors which make it difficult, if not impossible, to trace or identify the amount of the particular contributions thereto. It is true that some of the funds received from outside sources stand on a different basis from that of the ratio of assessed valuations. Yet the fund however built up inured to the benefit of the taxpayers of the entire county, whether derived from county levies or from other sources. Funds from sources other than

county levies were treated as though they were received from such levies.

Thus, it would seem that a city's just and equitable interest in the balance of the General Fund should be in the same proportion that the funds therein embraced which were derived from levies in the city bore to the money in said funds which were derived from levies in the county as a whole, including the town. *School Board* v. *County School Board, supra,* 189 Va. page 216. The only difference between the ratio of levies collected and the ratio of assessed values is that which results from the non-payment of levies, not necessarily a substantial variance.

The same principle applicable to the General Fund should likewise govern the adjustment in considering the city's just proportionate interest in "any unexpended balance in the county treasury belonging" to the Public Assistance, County Road, and County School Funds. Each of those funds was, in part, derived from like sources, and subject to like apportionment for the benefit of the whole county, including the town.

The Public Assistance Fund is made up of monthly remittances from Federal and State appropriations, plus periodic transfers from the General Fund of the County; while the required accumulation and distribution of these funds are dependent upon the current case load of welfare recipients which vary from time to time according to economic conditions. The fund is held for the benefit of the entire County, including the former town, subject to the requirements of aid to needy persons in the town or in the County outside of the town.

The County Road Fund is made up of discontinued road levies, and composed of funds received from the Federal Government, the State and the County. The record does not disclose their respective contributions; but the several components of the fund are held for application to the several magisterial district roads and for other magisterial district purposes.

The record does not show exactly how the School Fund is made up, except that its funds come mainly from the Federal Government, the State, and appropriations made by the County from the General Fund. Since 1942, school taxes have come from a uniform levy laid on property without regard to its situs, the rate varying only as to the character of the property and the amount needed in different years. The County Board had full authority to appropriate for general school purposes the monies received from County levies as well as the money received from other sources. The County concedes that in an equitable adjustment, "the new City operating as a separate school district," is entitled to the same "equitable ownership" of the County school operating fund as determined in *School Board v. County School Board; supra,* 189 Va. page 216, a division based upon the ratio of actual tax collections in the town and in the county as a whole.

The Dog Tax Fund is derived from the sale of dog licenses, and is used for the purposes named in Code, § 29-209. The year-end balance, except a limited amount, is available for transfer to the General Fund. We agree with the trial court that the City is entitled to share in that fund in the proportion of payments made by residents within the city to payments made by residents of the county as a whole. This proportion should be readily ascertainable.

It would seem impossible to arrive at an "equitable" and "just" adjustment in a transition proceeding, unless consideration be given to the public assets possessed by a county, and the means of their acquisition. Before transition, the taxpayers of the town, together with the taxpayers of the county, provide the means for the creation of the public property of the county. Since a newly created city of the second class is further required to assume a proportion of the debt of the county of which it was formerly a part, equity and good conscience require that it be credited on its debt assumption with that same proportion of the

value of the school buildings and equipment of the county for which the county's debt was incurred.

The phrase "all other equitable claims of the county, district or city," was, we think, inserted for such purpose. If it had been omitted from the statute, only the two former factors specifically mentioned could have been considered in making an equitable adjustment.

We come next to the specific questions of title to, and reimbursement or compensation for, the elementary school in Colonial Heights. The transition statute does not specifically provide for the transfer of a county school situated within the limits of a newly created city to the city or the city school board. However, in considering "all other equitable claims," we must have regard for the circumstances in connection with which the language of the statute is employed. It is significant that sec. 15-102 uses both "reimbursement" and "compensation" in prescribing the adjustment of a debt assumption. In *Henrico* v. *City of Richmond, supra,* 177 Va. page 795, we said, "Reimbursement" means a return or restoration of the equivalent for something paid or expended, that is, a refunding or repayment. "Compensation" means the giving of an equivalent or substitute of equal value for something received or for loss suffered. Black's Law Dictionary, De Luxe Edition, page 377.

We are, therefore, of opinion that the claim of the City to the elementary school within the City constitutes, under the circumstances here, an equitable claim. The cost of its construction, with later additions, was $65,000. Of this amount $40,000 was paid entirely by Matoaca District, of which District the former town of Colonial Heights composed the larger part. The balance was paid by the County as a whole, including the territory within the City.

We agree with the trial judge that, as a matter of equity and fair dealing in the adjustment of the debt of the County between the principal parties, since the contribution of the territory within the City to the school property owned by

the County greatly exceeds the fair value of the elementary school and its equipment, the County School Board should convey this school to the School Board of the City, together with its equipment.

We further agree with the trial judge that since the total credits to the City for its "just proportion of money collected by the county treasurer" for 1948 taxes, and the unexpended balances in the county treasury, together with its equitable rights in public property of the County outside of the City, exceed the sum of its debt assumption and the value of the elementary school in the City, it is not necessary that further evidence be taken to ascertain the exact dollar amount of such credits, or the exact value of the schools and their equipment. All claims of the County assertible under the statute are thereby completely offset. There is no express or implied intendment of the transition statute that a city is entitled to recover the excess of its claim over the amount of the debt assumption. There is nothing to show that the legislature intended a county to contribute to a new city further than we have indicated.

In summation, we are of opinion, under the facts of this case, that secs. 15-101 and 15-102 require that: (1) The City assume 12.13% of the debt of the County; (2) That there be credited on such debt assumption 287/366ths of all taxes collected by the county treasurer, under Code, sec. 15-101, and the City's *pro rata* portion of the unexpended balances in the General, Public Assistance, County Road, County School, and Dog Tax Funds, as hereinbefore determined; (3) That there be further credited on such debt assumption 12.13% of the value of all school buildings and equipment in the County and City; (4) That in view of the fact that the allowable equitable claims of the City in the school property of the County exceed the fair value of the elementary school and equipment within the City, the County School Board convey to the City School Board the said elementary school; and (5) That the City pay to the County $14,249.53 for services rendered in the interim

between the date of transition and commencement of pay for such services, plus the sum of $54,194.67; the latter amount representing a portion of 1948 taxes received by the City and credits on certain subsequent and independent obligations to the County, allowed by decrees entered by the trial court on May 12, 1949 and January 19, 1950.

We find no merit in the contention that the trial court erred in not dismissing the bill of complainants, on the grounds the bill contained no allegations, and the evidence failed to show, that any attempt was made to by the County School Board and the City Council to agree upon an adjustment of the debts of the County, as provided in sec. 15-102. The City argues that Code, sec. 15-103 provided that this proceeding could be instituted only by the County School Board against the Council of the City, after the County School Board and the City Council had failed to agree.

The answer to this contention is simply that the school indebtedness is a county debt, as we have stated. Moreover, the County School Board, in its answer, ratified the action of the County Board of Supervisors in its futile attempt to obtain an agreement with the City Council, and all of the parties apparently waived any question of jurisdiction in the procedure adopted.

The motion to dismiss is purely dilatory. It is evident that the principal parties are in serious disagreement. The disagreement has already lasted about six years, and no good can result from a further delay of matters which should be and must be settled at some time.

Subject to the modifications herein indicated, the decree of the trial court is affirmed, and the cause remanded for such further proceedings as may be necessary and proper, in accordance with the views herein expressed. The County of Chesterfield having substantially prevailed on this appeal will recover its costs in this behalf expended.

*Affirmed as modified and remanded.*