Pecola Annette WRIGHT et al., Appellees,

v.

COUNCIL OF the CITY OF EMPORIA and the members thereof, and School Board of the City of Emporia and the members thereof, Appellants.

No. 14552.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 8, 1970.

Decided March 23, 1971.

Winter, Circuit Judge, dissented and filed opinion, see 442 F.2d 588.

Sobeloff, Circuit Judge, did not participate.

Butzner, Circuit Judge, disqualified himself in an opinion.

John F. Kay, Jr., Richmond, Va., and D. Dortch Warriner, Emporia, Va. (Warriner, Outten, Slagle & Barrett, Emporia, Va., and Mays, Valentine, Davenport & Moore, Richmond, Va., on brief) for appellants.

S. W. Tucker, Richmond, Va. (Henry L. Marsh, III, and Hill, Tucker & Marsh, Richmond, Va., and Jack Greenberg, James M. Nabrit, III, and Norman Chachkin, New York City, on brief) for appellees.

Before HAYNSWORTH, Chief Judge, and BOREMAN, BRYAN, WINTER, and CRAVEN, Circuit Judges sitting en banc.*

CRAVEN, Circuit Judge:

In this case and two others now under submission en banc we must determine the extent of the power of state government to redesign the geographic boundaries of school districts.[1] Ordinarily, it would seem to be plenary but in school districts with a history of racial segregation enforced through state action, close scrutiny is required to assure there has not been gerrymandering for the purpose of perpetuating invidious discrimination.

Each of these cases involve a county school district in which there is a substantial majority of black students out of which was carved a new school district comprised of a city or a city plus an area surrounding the city. In each case, the resident students of the new city unit are approximately 50 percent black and 50 percent white. In each

---

* Circuit Judge Sobeloff did not participate. Circuit Judge Butzner disqualified himself because he participated as a district judge in an earlier stage of this case.

1. The other two cases are United States v. Scotland Neck City Board of Education, 442 F.2d 575 Nos. 14,929 and 14,930 (4th Cir. 1971) and Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 No. 14,990 (4th Cir. 1971).

case, the district court enjoined the establishment of the new school district. In this case, we reverse.

## I.

■ If legislation creating a new school district produces a shift in the racial balance which is great enough to support an inference that the purpose of the legislation is to perpetuate segregation, and the district judge draws the inference, the enactment falls under the Fourteenth Amendment and the establishment of such a new school district must be enjoined. See Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Cf. Haney v. County Board of Education of Sevier County, 410 F.2d 920 (8th Cir. 1969); Burleson v. County Board of Election Commissioners of Jefferson County, 308 F.Supp. 352 (E.D.Ark.) aff'd 432 F.2d 1356 (8th Cir. Nov. 18, 1970). But where the shift is merely a modification of the racial ratio rather than effective resegregation the problem becomes more difficult.

■ The creation of new school districts may be desirable and/or necessary to promote the legitimate state interest of providing quality education for the state's children. The refusal to allow the creation of any new school districts where there is any change in the racial makeup of the school districts could seriously impair the state's ability to achieve this goal. At the same time, the history of school integration is replete with numerous examples of actions by state officials to impede the mandate of Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). There is serious danger that the creation of new school districts may prove to be yet another method to obstruct the transition from racially separated school systems to school systems in which no child is denied the right to attend a school on the basis of race. Determining into which of these two categories a particular case fits requires a careful analysis of the facts of each case to discern the dominant purpose of boundary realignment. If the creation of a new school district is designed to further the aim of providing quality education and is attended secondarily by a modification of the racial balance, short of resegregation, the federal courts should not interfere. If, however, the primary purpose for creating a new school district is to retain as much of separation of the races as possible, the state has violated its affirmative constitutional duty to end state supported school segregation. The test is much easier to state than it is to apply.

## II.

Emporia became a city of the so-called second class on July 31, 1967, pursuant to a statutory procedure established at least as early as 1892. See 3 Va.Code §§ 15.1–978 to –998 (1950); Acts of the Assembly 1891–92, ch. 595. Prior to that time it was an incorporated town and as such was part of Greensville County. At the time city status was attained Greensville County was operating public schools under a freedom of choice plan approved by the district court, and Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), invalidating freedom of choice unless it "worked," could not have been anticipated by Emporia, and indeed, was not envisioned by this court. Bowman v. County School Board of Charles City County, 382 F.2d 326 (4th Cir. 1967). The record does not suggest that Emporia chose to become a city in order to prevent or diminish integration. Instead, the motivation appears to have been an unfair allocation of tax revenues by county officials.

One of the duties imposed on Emporia by the Virginia statutes as a city of the second class was to establish a school board to supervise the public education of the city's children. Under the Virginia statutes, Emporia had the option of operating its own school system or to work out one of a number of alterna-

tives under which its children would continue to attend school jointly with the county children. Emporia considered operating a separate school system but decided it would not be practical to do so immediately at the time of its independence. There was an effort to work out some form of joint operation with the Greensville County schools in which decision making power would be shared. The county refused. Emporia finally signed a contract with the county on April 10, 1968, under which the city school children would attend schools operated by the Greensville County School Board in exchange for a percentage of the school system's operating cost. Emporia agreed to this form of operation only when given an ultimatum by the county in March 1968 that it would stop educating the city children mid-term unless some agreement was reached.

At the same time that the county was engaged in its controversy with Emporia about the means of educating the city children, the county was also engaged in a controversy over the elimination of racial segregation in the county schools. Until some time in 1968, Greensville County operated under a freedom of choice plan. At that time the plaintiffs in this action successfully urged upon the district court that the freedom of choice plan did not operate to disestablish the previously existing dual school system and thus was inadequate under Green v. County School Board of New Kent County, *supra*. After considering various alternatives, the district court, in an order dated June 25, 1969, paired all the schools in Greensville County.

Also in June 1969, Emporia was notified for the first time by counsel that in all probability its contract with the county for the education of the city children was void under state law. The city then filed an action in the state courts to have the contract declared void and notified the county that it was ending its contractual relationship forthwith. Par-

ents of city school children were notified that their children would attend a city school system. On August 1, 1969, the plaintiffs filed a supplemental complaint seeking an injunction against the City Council and the City School Board to prevent the establishment of a separate school district. A preliminary injunction against the operation of a separate system was issued on August 8, 1969. The temporary injunction was made permanent on March 3, 1969.[2]

The Emporia city unit would not be a white island in an otherwise heavily black county. In fact, even in Emporia there will be a majority of black students in the public schools, 52 percent black to 48 percent white. Under the plan presented by Emporia to the district court, all of the students living within the city boundaries would attend a single high school and a single grade school. At the high school there would be a slight white majority, 48 percent black and 52 percent white, while in the grade school there would be a slight black majority, 54 percent black and 46 percent white. The city limits of Emporia provide a natural geographic boundary for a school district.

The student population of the Greensville County School District without the separation of the city unit is 66 percent black and 34 percent white. The students remaining in the geographic jurisdiction of the county unit after the separation would be 72 percent black and 28 percent white. Thus, the separation of the Emporia students would create a shift of the racial balance in the remaining county unit of 6 percent. Regardless of whether the city students attend a separate school system, there will be a substantial majority of black students in the county system.

■ Not only does the effect of the separation not demonstrate that the primary purpose of the separation was to perpetuate segregation, but there is strong evidence to the contrary. Indeed,

2. The decision of the court below is reported as Wright v. County School Board of Greensville County, 309 F.Supp. 671 (E.D.Va.1970).

the district court found that Emporia officials had other purposes in mind. Emporia hired Dr. Neil H. Tracey, a professor of education at the University of North Carolina, to evaluate the plan adopted by the district court for Greensville County and compare it with Emporia's proposal for its own school system. Dr. Tracey said his studies were made with the understanding that it was not the intent of the city to resegregate. He testified that the plan adopted for Greensville County would require additional expenditures for transportation and that an examination of the proposed budget for the Greensville County Schools indicated that not only would the additional expenditures not be forthcoming but that the budget increase over the previous year would not even keep up with increased costs due to inflation. Emporia on the other hand proposed increased revenues to increase the quality of education for its students and in Dr. Tracey's opinion the proposed Emporia system would be educationally superior to the Greensville system. Emporia proposed lower student teacher ratios, increased per pupil expenditures, health services, adult education, and the addition of a kindergarten program.

In sum, Emporia's position, referred to by the district court as "uncontradicted," was that effective integration of the schools in the whole county would require increased expenditures in order to preserve education quality, that the county officials were unwilling to provide the necessary funds, and that therefore the city would accept the burden of educating the city children. In this context, it is important to note the unusual nature of the organization of city and county governments in Virginia. Cities and counties are completely independent, both politically and geographically. See City of Richmond v. County Board, 199 Va. 679, 684, 101 S.E.2d 641 (1958); Murray v. Roanoke, 192 Va. 321, 324, 64 S.E.2d 804 (1951). When Emporia was a town, it was politically part of the county and the people of Emporia were able to elect representatives to the county board of supervisors. When Emporia became a city, it was completely separated from the county and no longer has any representation on the county board. In order for Emporia to achieve an increase in school expenditures for city schools it would have to obtain the approval of the Greensville County Board of Supervisors whose constituents do not include city residents.

Determining what is desirable or necessary in terms of funding for quality education is the responsibility of state and school district officers and is not for our determination. The question that the federal courts must decide is, rather, what is the primary purpose of the proposed action of the state officials. See Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065 (1969). Is the primary purpose a benign one or is the claimed benign purpose merely a cover-up for racial discrimination? The district court must, of course, consider evidence about the need for and efficacy of the proposed action to determine the good faith of the state officials' claim of benign purpose. In this case, the court did so and found explicitly that "[t]he city clearly contemplates a superior quality educational program. It is anticipated that the cost will be such as to require higher tax payments by city residents." 309 F.Supp. at 674. Notably, there was no finding of discriminatory purpose, and instead the court noted its satisfaction that the city would, if permitted, operate its own system on a unitary basis.

We think the district court's injunction against the operation of a separate school district for the City of Emporia was improvidently entered and unnecessarily sacrifices legitimate and benign educational improvement. In his commendable concern to prevent resegregation—under whatever guise—the district judge momentarily overlooked, we think, his broad discretion in approving equitable remedies and the practical flexibility recommended by *Brown II* in reconciling public and private needs. We

reverse the judgment of the district court and remand with instructions to dissolve the injunction.

Because of the possibility that Emporia might institute a plan for transferring students into the city system from the county system resulting in re-segregation,[3] or that the hiring of teachers to serve the Emporia school system might result in segregated faculties, the district court is directed to retain jurisdiction.

Reversed and remanded.

BUTZNER, Circuit Judge:

This appeal involves the same case in which I decided questions concerning the school board's compliance with the Fourteenth Amendment when I served on the district court.[*] While the details differ, the same basic issues remain—the validity of measures taken to disestablish a dual school system, to create a unitary system, and to assign pupils and faculty to achieve these ends.

Title 28 U.S.C. § 47 provides:

"No judge shall hear or determine an appeal from the decision of a case or issue tried by him."

Recently, Judge Craven carefully examined this statute and the cases and authorities which cast light on it. He concluded that he should not sit on an appeal of a case in which he had participated as a district judge when the ultimate questions were the same: "what may a school board be compelled to do to dismantle a dual system and implement a unitary one, or how much school board action is enough?" See Swann v. Charlotte-Mecklenburg Bd. of Ed., 431 F.2d 135 (4th Cir. 1970). Following the sound precedent established by Judge Craven, I believe that I must disqualify myself from participating in this appeal.

---

3. A notice of August 31, 1969, invited applications from the county. Subsequently, the city assured the district court it would not entertain such applications without court permission.

* See Wright v. County School Bd. of Greensville County, Va., 252 F.Supp. 378 (E.D.Va.1966). Two other opinions were not published.