## WRIGHT et al. v. COUNCIL OF THE CITY OF EMPORIA et al.

No. 70–188.   Argued March 1, 1972—Decided June 22, 1972

452

STEWART, J., delivered the opinion of the Court, in which DOUGLAS, BRENNAN, WHITE, and MARSHALL, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which BLACKMUN, POWELL, and REHNQUIST, JJ., joined, *post*, p. 471.

*Samuel W. Tucker* argued the cause for petitioners. With him on the brief were *Jack Greenberg, James M. Nabrit III,* and *Norman J. Chachkin.*

*D. Dortch Warriner* argued the cause for respondents. With him on the brief was *John F. Kay, Jr.*

*Solicitor General Griswold, Assistant Attorney General Norman,* and *Deputy Solicitor General Wallace* filed a memorandum for the United States as *amicus curiae* urging reversal.

MR. JUSTICE STEWART delivered the opinion of the Court.

We granted certiorari in this case, as in No. 70–130, *United States* v. *Scotland Neck City Board of Education*,[1] *post,* p. 484, to consider the circumstances under

---

[1] Together with No. 70–187, *Cotton* v. *Scotland Neck City Board of Education.*

which a federal court may enjoin state or local officials from carving out a new school district from an existing district that has not yet completed the process of dismantling a system of enforced racial segregation. We did not address ourselves to this rather narrow question in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U. S. 1, and its companion cases decided last Term,[2] but the problem has confronted other federal courts in one form or another on numerous occasions in recent years.[3] Here, as in *Scotland Neck,* the Court of Appeals reversed a district court decision enjoining the creation of a new school district. 442 F. 2d 570. We conclude that the Court of Appeals erred in its interpretation of the legal principles applicable in cases such as these, and that the District Court's order was proper in the circumstances of this case.

## I

The City of Emporia lies near the center of Greensville County, Virginia, a largely rural area located on the North Carolina border. Until 1967, Emporia was

---

[2] The companion cases were *Davis v. Board of School Commissioners,* 402 U. S. 33; *McDaniel v. Barresi,* 402 U. S. 39; *Board of Education v. Swann,* 402 U. S. 43; and *Moore v. Board of Education,* 402 U. S. 47.

[3] On the same day that it reversed the District Court orders in this case and in the *Scotland Neck* cases, the Court of Appeals for the Fourth Circuit affirmed an order enjoining the creation of a new school district in another county of North Carolina. *Turner v. Littleton-Lake Gaston School District,* 442 F. 2d 584. Other cases dealing with attempts to split school districts in the process of desegregation are *Lee v. Macon County Board of Education,* 448 F. 2d 746; *Stout v. Jefferson County Board of Education,* 448 F. 2d 403; *Haney v. County Board of Education,* 410 F. 2d 920; *United States v. Texas,* 321 F. Supp. 1043, 1052, aff'd, with modifications, 447 F. 2d 441; *Burleson v. County Board of Election Commissioners,* 308 F. Supp. 352, aff'd, 432 F. 2d 1356; *Aytch v. Mitchell,* 320 F. Supp. 1372.

a "town" under Virginia law, which meant that it was a part of the surrounding county for practically all purposes, including the purpose of providing public education for children residing in the county.

In 1967, Emporia, apparently dissatisfied with the county's allocation of revenues from the newly enacted state sales tax, successfully sought designation as a "city of the second class."[4] As such, it became politically independent from the surrounding county, and undertook a separate obligation under state law to provide free public schooling to children residing within its borders.[5] To fulfill this responsibility, Emporia at first sought the county's agreement to continue operating the school system on virtually the same basis as before, with Emporia sharing in the administration as well as the financing of the schools.[6] When the county officials refused to enter into an arrangement of this kind, Emporia agreed to a contract whereby the county would continue to educate students residing in the city in exchange for Emporia's payment of a specified share of the total cost of the system. Under this agreement, signed in April 1968, Emporia had a formal voice in the administration of the schools only through its par-

---

[4] Va. Code Ann. § 15.1–982.

[5] See Va. Code Ann. § 22–93; *Colonial Heights v. County of Chesterfield*, 196 Va. 155, 82 S. E. 2d 566 (1954).

[6] Emporia was entitled under state law to establish an independent school system when it became a city in 1967, but it chose not to do so because, according to the testimony of the chairman of the city school board, a separate system did not seem practical at the time. In a letter to the County Board of Supervisors in July 1969, the Emporia City Council stated that it had authorized a combined system in 1968 because it believed that "the educational interest of Emporia citizens, their children and those of the citizens and children of Greensville County, could best be served by continuing a combined City-County school division, thus giving students from both political subdivisions full benefits of a larger school system."

ticipation in the selection of a superintendent. The city and county were designated as a single school "division" by the State Board of Education,[7] and this arrangement was still in effect at the time of the District Court's order challenged in this case.

This lawsuit began in 1965, when a complaint was filed on behalf of Negro children seeking an end to state-enforced racial segregation in the Greensville County school system. Prior to 1965, the elementary and high schools located in Emporia served all white children in the county, while Negro children throughout the county were assigned to a single high school or one of four elementary schools, all but one of which were located outside the Emporia town boundary. In January 1966, the District Court approved a so-called "freedom of choice" plan that had been adopted by the county in April of the previous year. *Wright* v. *School Board of Greensville County,* 252 F. Supp. 378. No white students ever attended the Negro schools under this plan, and in the 1968–1969 school year only 98 of the county's 2,510 Negro students attended white schools. The school faculties remained completely segregated.

Following our decision in *Green* v. *County School Board,* 391 U. S. 430, holding that a freedom-of-choice plan was an unacceptable method of desegregation where it failed "to provide meaningful assurance of prompt and effective disestablishment of a dual system," *id.,* at 438, the petitioners filed a motion for further relief. The District Court ordered the county to demonstrate its compliance with the holding in *Green,* or to submit a plan designed to bring the schools into compliance. After various delays, during which the freedom-of-choice sys-

---

[7] Under Virginia law as it stood in 1969, the school "division" was the basic unit for the purpose of school administration. See Va. Code Ann. §§ 22–30, 22–34, 22–100.1.

tem remained in effect, the county submitted two alternative plans. The first would have preserved the existing system with slight modifications, and the second would have assigned students to schools on the basis of curricular choices or standardized test scores. The District Court promptly rejected the first of these proposals, and took the second under advisement. Meanwhile, the petitioners submitted their own proposal, under which all children enrolled in a particular grade level would be assigned to the same school, thus eliminating any possibility of racial bias in pupil assignments. Following an evidentiary hearing on June 23, 1969, the District Court rejected the county's alternative plan, finding that it would "substitute . . . one segregated school system for another segregated school system." By an order dated June 25, the court ordered the county to implement the plan submitted by the petitioners, referred to by the parties as the "pairing" plan, as of the start of the 1969–1970 school year.[8]

Two weeks after the District Court entered its decree, the Emporia City Council sent a letter to the county Board of Supervisors announcing the city's intention to operate a separate school system beginning in September. The letter stated that an "in-depth study and analysis of the directed school arrangement reflects a totally unacceptable situation to the Citizens and City Council of the City of Emporia." It asked that the 1968 city-county agreement be terminated by mutual consent, and that title to school property located within Emporia be transferred to the city. The letter further

---

[8] The plan was later modified in certain respects at the request of the county school board, and as modified it has been in operation since September 1969. Because the four schools located outside Emporia's city limits are all in close proximity to the city, the "pairing" plan apparently involved little additional transportation of students.

advised that children residing in the county would be permitted to enroll in the city schools on a tuition basis.[9]  At no time during this period did the city officials meet with the county council or school board ,to discuss the implementation of the pairing decree, nor did they inform the District Court of their intentions with respect to the separate school system.

The county school board refused either to terminate the existing agreement or to transfer school buildings. to Emporia, citing its belief that Emporia's proposed action was "not in the best interest of the children in Greensville County."  The City Council and the City School Board nevertheless continued to take steps toward implementing the separate system throughout the month of July.  Notices were circulated inviting parents to register their children in the city system, and a request was made to the State Board of Education to certify Emporia as a separate school division.  This request was tabled by the State Board at its August meeting, "in light of matters pending in the federal court."

According to figures later supplied to the District Court, there were 3,759 children enrolled in the unitary system contemplated by the desegregation decree, of whom 66% were Negro and 34% were white.  Had Emporia established a separate school system, 1,123 of these students would have attended the city schools, of whom 48% were white.  It is undisputed that the city proposed to operate its own schools on a unitary

---

[9] The District Court took special note of this transfer arrangement in its memorandum accompanying the preliminary injunction issued in August 1969.  At the time of the final hearing, however, the respondents assured the court that if allowed to operate a separate system, they would not permit transfers from the county without prior permission of the court.

basis, with all children enrolled in any particular grade attending the same school.

On August 1, 1969, the petitioners filed a supplemental complaint naming the members of the Emporia City Council and the City School Board as additional parties defendant,[10] and seeking to enjoin them from withdrawing Emporia children from the county schools. At the conclusion of a hearing on August 8, the District Court found that the establishment of a separate school system by the city would constitute "an impermissible interference with and frustration of" its order of June 25, and preliminarily enjoined the respondents from taking "any action which would interfere in any manner whatsoever with the implementation of the Court's order heretofore entered. . . ."

The schools opened in September under the pairing order, while Emporia continued to work out detailed plans and budget estimates for a separate school system in the hope that the District Court would allow its implementation during the following school year. At a further hearing in December, the respondents presented an expert witness to testify as to the educational advantages of the proposed city system, and asked that the preliminary injunction be dissolved. On March 2, 1970, the District Court entered a memorandum opinion and order denying the respondents' motion and making the injunction permanent. 309 F. Supp. 671. The

---

[10] Because the county school board had ultimate responsibility for the administration of the schools under the combined system, the members of the Emporia school board were not originally parties to the lawsuit. But the District Court's desegregation decree bound both county officials "and their successors," and the District Court treated the Emporia school board members, insofar as they intended to replace the county board as administrators of part of the system under court order, as "successors" to the members of the county board.

Court of Appeals for the Fourth Circuit reversed, 442 F. 2d 570, but stayed its mandate pending action by this Court on a petition for certiorari, which we granted. 404 U. S. 820.

## II

Emporia takes the position that since it is a separate political jurisdiction entitled under state law to establish a school system independent of the county, its action may be enjoined only upon a finding either that the state law under which it acted is invalid, that the boundaries of the city are drawn so as to exclude Negroes, or that the disparity of the racial balance of the city and county schools of itself violates the Constitution. As we read its opinion, the District Court made no such findings; nor do we.

The constitutional violation that formed the predicate for the District Court's action was the enforcement until 1969 of racial segregation in a public school system of which Emporia had always been a part. That finding has not been challenged, nor has Emporia questioned the propriety of the "pairing" order of June 25, 1969, which was designed to remedy the condition that offended the Constitution. Both before and after it became a city, Emporia educated its children in the county schools. Only when it became clear—15 years after our decision in *Brown* v. *Board of Education,* 347 U. S. 483—that segregation in the county system was finally to be abolished, did Emporia attempt to take its children out of the county system. Under these circumstances, the power of the District Court to enjoin Emporia's withdrawal from that system need not rest upon an independent constitutional violation. The court's remedial power was invoked on the basis of a finding that the dual school system violated the Constitution, and since the city and the county constituted

but one unit for the purpose of student assignments during the entire time that the dual system was maintained, they were properly treated as a single unit for the purpose of dismantling that system.

In *Green* v. *County School Board,* 391 U. S. 430, the issue was whether the school board's adoption of a "freedom of choice" plan constituted adequate compliance with the mandate of *Brown* v. *Board of Education,* 349 U. S. 294 (*Brown II*). We did not hold that a freedom-of-choice plan is of itself unconstitutional. Rather, we decided that *any* plan is "unacceptable" where it "fails to provide meaningful assurance of prompt and effective disestablishment of a dual system. . . ." 391 U. S., at 438. In *Monroe* v. *Board of Commissioners,* 391 U. S. 450, we applied the same principle in rejecting a "free transfer" plan adopted by the school board as a method of desegregation:

> "We do not hold that 'free transfer' can have no place in a desegregation plan. But like 'freedom of choice,' if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system, it must be held unacceptable." *Id.,* at 459.

The effect of Emporia's proposal was to erect new boundary lines for the purpose of school attendance in a district where no such lines had previously existed, and where a dual school system had long flourished. Under the principles of *Green* and *Monroe,* such a proposal must be judged according to whether it hinders or furthers the process of school desegregation. If the proposal would impede the dismantling of the dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out.

The Court of Appeals apparently did not believe this case to be governed by the principles of *Green* and

*Monroe.*[11]   It held that the question whether new school district boundaries should be permitted in areas with a history of state-enforced racial segregation is to be resolved in terms of the "dominant purpose of [the] boundary realignment."

> "If the creation of a new school district is designed to further the aim of providing quality education and is attended secondarily by a modification of the racial balance, short of resegregation, the federal courts should not interfere.  If, however, the primary purpose for creating a new school district is to retain as much of separation of the races as possible, the state has violated its affirmative constitutional duty to end state supported school segregation."   442 F. 2d, at 572.

Although the District Court had found that "in a sense, race was a factor in the city's decision to secede," 309 F. Supp., at 680, the Court of Appeals found that the primary purpose of Emporia's action was "benign," and was not "merely a cover-up" for racial discrimination. 442 F. 2d, at 574.

This "dominant purpose" test finds no precedent in our decisions.  It is true that where an action by school authorities is motivated by a demonstrated discriminatory purpose, the existence of that purpose may add to the discriminatory effect of the action by intensifying the stigma of implied racial inferiority.  And where a school board offers nonracial justifications for a plan that is less effective than other alternatives for dismantling a dual school system, a demonstrated racial purpose may be taken into consideration in determining the weight to be given to the proffered justification.

---

[11] The decision of the Court of Appeals was rendered less than a month prior to our decision in *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1.

Cf. *Green, supra,* at 439. But as we said in *Palmer* v. *Thompson,* 403 U. S. 217, 225, it "is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices of a group of legislators," and the same may be said of the choices of a school board. In addition, an inquiry into the "dominant" motivation of school authorities is as irrelevant as it is fruitless. The mandate of *Brown II* was to desegregate schools, and we have said that "[t]he measure of any desegregation plan is its effectiveness." *Davis* v. *School Commissioners of Mobile County,* 402 U. S. 33, 37. Thus, we have focused upon the effect—not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. The existence of a permissible purpose cannot sustain an action that has an impermissible effect.

The reasoning of the Court of Appeals in this case is at odds with that of other federal courts that have held that splinter school districts may not be created "where the effect—to say nothing of the purpose—of the secession has a substantial adverse effect on desegregation of the county school district." *Lee* v. *Macon County Board of Education,* 448 F. 2d 746, 752. See also *Stout* v. *Jefferson County Board of Education,* 448 F. 2d 403, 404; *Haney* v. *County Board of Education,* 410 F. 2d 920, 924; *Burleson* v. *County Board of Election Commissioners,* 308 F. Supp. 352, 356, aff'd, 432 F. 2d 1356; *Aytch* v. *Mitchell,* 320 F. Supp. 1372, 1377. Though the *purpose* of the new school districts was found to be discriminatory in many of these cases, the courts' holdings rested not on motivation or purpose, but on the *effect* of the action upon the dismantling of the dual school systems involved. That was the focus of the District Court in this case, and we hold that its approach was proper.

## III

The basis for the District Court's ruling was its conclusion that if Emporia were allowed to establish an independent system, Negroes remaining in the county schools would be deprived of what *Brown II* promised them: a school system in which all vestiges of enforced racial segregation have been eliminated. The District Court noted that the effect of Emporia's withdrawal would be a "substantial increase in the proportion of whites in the schools attended by city residents, and a concomitant decrease in the county schools." 309 F. Supp., at 680. In addition, the court found that the departure of the city's students, its leadership, and its financial support, together with the possible loss of teachers to the new system, would diminish the chances that transition to unitary schools in the county would prove "successful."

Certainly, desegregation is not achieved by splitting a single school system operating "white schools" and "Negro schools" into two new systems, each operating unitary schools within its borders, where one of the two new systems is, in fact, "white" and the other is, in fact, "Negro." Nor does a court supervising the process of desegregation exercise its remedial discretion responsibly where it approves a plan that, in the hope of providing better "quality education" to some children, has a substantial adverse effect upon the quality of education available to others. In some cases, it may be readily perceived that a proposed subdivision of a school district will produce one or both of these results. In other cases, the likelihood of such results may be less apparent. This case is of the latter kind, but an examination of the record shows that the District Court's conclusions were adequately supported by the evidence.

Data submitted to the District Court at its December hearing showed that the school system in operation under the "pairing" plan, including both Emporia and the county, had a racial composition of 34% white and 66% Negro. If Emporia had established its own system, and if total enrollment had remained the same, the city's schools would have been 48% white and 52% Negro, while the county's schools would have been 28% white and 72% Negro.

We need not and do not hold that this disparity in the racial composition of the two systems would be a sufficient reason, standing alone, to enjoin the creation of the separate school district. The fact that a school board's desegregation plan leaves some disparity in racial balance among various schools in the system does not alone make that plan unacceptable.[12] We observed in *Swann, supra,* that "[t]he constitutional command to de-segregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." 402 U. S., at 24.

But there is more to this case than the disparity in racial percentages reflected by the figures supplied by the school board. In the first place, the District Court found that if Emporia were allowed to withdraw from the existing system, it "may be anticipated that the proportion of whites in county schools may drop as those who can register in private academies," 309 F. Supp., at 680, while some whites might return to the city schools from the private schools in which they had previously enrolled. Thus, in the judgment of the District Court, the statistical breakdown of the 1969–1970 enrollment figures between city residents and county

---

[12] The court order that we approved in *Swann, supra,* itself provided for student bodies ranging from 9% Negro to 38% Negro.

residents did not reflect what the situation would have been had Emporia established its own school system.

Second, the significance of any racial disparity in this case is enhanced by the fact that the two formerly all-white schools are located within Emporia, while all the schools located in the-surrounding county were formerly all-Negro. The record further reflects that the school buildings in Emporia are better equipped and are located on better sites than are those in the county. We noted in *Swann* that factors such as these may in themselves indicate that enforced racial segregation has been perpetuated:

> "Independent of student assignment, where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." 402 U. S., at 18.

Just as racial balance is not required in remedying a dual system, neither are racial ratios the sole consideration to be taken into account in devising a workable remedy.

The timing of Emporia's action is a third factor that was properly taken into account by the District Court in assessing the effect of the action upon children remaining in the county schools. While Emporia had long had the right under state law to establish a separate school system, its decision to do so came only upon the basis of—and, as the city officials conceded, in reaction to—a court order that prevented the county system from maintaining any longer the segregated system that had lingered for 15 years after *Brown I*. In the words of Judge Winter, dissenting in the Court

of Appeals, "[i]f the establishment of an Emporia school district is not enjoined, the black students in the county will watch as nearly one-half the total number of white students in the county abandon the county schools for a substantially whiter system." 442 F. 2d, at 590. The message of this action, coming when it did, cannot have escaped the Negro children in the county. As we noted in *Brown I:* "To separate [Negro school children] from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." 347 U. S., at 494. We think that, under the circumstances, the District Court could rationally have concluded that the same adverse psychological effect was likely to result from Emporia's withdrawal of its children from the Greensville County system.

The weighing of these factors to determine their effect upon the process of desegregation is a delicate task that is aided by a sensitivity to local conditions, and the judgment is primarily the responsibility of the district judge. See *Brown II, supra,* at 299.[13] Given the totality of the circumstances, we hold that the District Court was justified in its conclusion that Emporia's establishment of a separate system would actually impede the process of dismantling the existing dual system.

---

[13] "Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal." 349 U. S., at 299.

## IV

Against these considerations, Emporia advances arguments that a separate system is necessary to achieve "quality education" for city residents, and that it is unfair in any event to force the city to continue to send its children to schools over which the city, because of the character of its arrangement with the county, has very little control. These arguments are entitled to consideration by a court exercising its equitable discretion where they are directed to the feasibility or practicality of the proposed remedy. See *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* at 31. But, as we said in *Green* v. *County School Board, supra,* the availability of "more promising courses of action" to dismantle a dual system "at the least . . . places a heavy burden upon the board to explain *its* preference for an apparently less effective method." 391 U. S., at 439.

In evaluating Emporia's claims, it must be remembered that the city represents the interests of less than one-third of the students in the system being desegregated. Only the city officials argue that their plan is preferable to the "pairing" plan encompassing the whole of the city-county system. Although the county school board took no position in the District Court either for or against Emporia's action, it had previously adopted a resolution stating its belief that the city's action was not in the best interests of the county children. In terms of *Green,* it was only the respondents—not the county school board—who expressed a "preference for an apparently less effective method" of desegregation.

At the final hearing in the District Court, the respondents presented detailed budgetary proposals and other evidence demonstrating that they contemplated a more

diverse and more expensive educational program than
that to which the city children had been accustomed
in the Greensville County schools. These plans for
the city system were developed after the preliminary
injunction was issued in this case. In August 1969,
one month before classes were scheduled to open, the
city officials were intent upon operating a separate sys-
tem despite the fact that the city had no buildings
under lease, no teachers under contract, and no specific
plans for the operation of the schools. Thus, the per-
suasiveness of the "quality education" rationale was
open to question. More important, however, any in-
creased quality of education provided to city students
would, under the circumstances found by the District
Court, have been purchased only at the price of a sub-
stantial adverse effect upon the viability of the county
system. The District Court, with its responsibility to
provide an effective remedy for segregation in the entire
city-county system, could not properly allow the city to
make its part of that system more attractive where such
a result would be accomplished at the expense of the
children remaining in the county.

A more weighty consideration put forth by Emporia
is its lack of formal control over the school system
under the terms of its contract with the county. This
argument is properly addressed to the practicality of
the District Court's action. As we said in *Davis* v.
*School Commissioners of Mobile County*, 402 U. S.,
at 37:

> "Having once found a violation, the district judge
> or school authorities should make every effort to
> achieve the greatest possible degree of actual de-
> segregation, taking into account the practicalities
> of the situation."

And in *Swann, supra*, we noted that a desegregation
plan cannot be regarded as a proper exercise of a dis-

trict court's discretion where it is not "reasonable, feasible and workable." 402 U. S., at 31.

We do not underestimate the deficiencies, from Emporia's standpoint, in the arrangement by which it undertook in 1968 to provide for the education of its children. Direct control over decisions vitally affecting the education of one's children is a need that is strongly felt in our society, and since 1967 the citizens of Emporia have had little of that control. But Emporia did find its arrangement with the county both feasible and practical up until the time of the desegregation decree issued in the summer of 1969. While city officials testified that they were dissatisfied with the terms of the contract prior to that time, they did not attempt to change it. They argued that the arrangement became intolerable when the "pairing" decree was entered, because the county officials who would control the budget of the unitary system lacked the desire to make the unitary system work. The District Court did not accept the contention that a lack of enthusiasm on the part of county leaders would, if Emporia children remained in the system, block a successful transition to unitary schools. The court felt that the "desire of the city leaders, coupled with their obvious leadership ability," would make itself felt despite the absence of any formal control by the city over the system's budget and operation, and that the city's leadership would be "an important facet in the successful operation of any court-ordered plan." 309 F. Supp., at 679. Under these circumstances, we cannot say that the enforced continuation of the single city-county system was not "reasonable, feasible and workable." [14]

---

[14] City officials testified that one of the primary objections to the court's "pairing" decree was that it required a student to attend six schools in the space of 12 years. Dr. Tracey, the expert witness for the respondents, expressed the view that this aspect of the decree

The District Court explicitly noted in its opinion that its injunction does not have the effect of locking Emporia into its present circumstances for all time. As already noted, our holding today does not rest upon a conclusion that the disparity in racial balance between the city and county schools resulting from separate systems would, absent any other considerations, be unacceptable. The city's creation of a separate school system was enjoined because of the effect it would have had at the time upon the effectiveness of the remedy ordered to dismantle the dual system that had long existed in the area. Once the unitary system has been established and accepted, it may be that Emporia, if it still desires to do so, may establish an independent system without such an adverse effect upon the students remaining in the county, or it may be able to work out a more satisfactory arrangement with the county for joint operation of the existing system. We hold only that a new school district may not be created where its effect would be to impede the process of dismantling a dual system. And in making that essentially factual determination in any particular case, "we must of necessity rely to a large extent, as this Court has for more than 16 years, on the informed judgment of the district courts in the first instance and on courts of appeals." *Swann, supra,* at 28. In this case, we believe that the District Court

---

had undesirable effects from an educator's point of view. This argument, however, was never made to the District Court either before or at the time it adopted the "pairing" plan. Indeed, the city officials never even met with the county school board or participated in the hearings that preceded the decree. After the June 25 order was entered, the District Court modified it at the request of the county board, and at the hearing on a preliminary injunction against Emporia's withdrawal from the system, the court noted that it would be "delighted to entertain motions for amendment of the [pairing] plan at any time." App. 185a.

did not abuse its discretion. For these reasons, the judgment of the Court of Appeals is

*Reversed.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN, MR. JUSTICE POWELL, and MR. JUSTICE REHNQUIST join, dissenting.

If it appeared that the city of Emporia's operation of a separate school system would either perpetuate racial segregation in the schools of the Greensville County area or otherwise frustrate the dismantling of the dual system in that area, I would unhesitatingly join in reversing the judgment of the Court of Appeals and reinstating the judgment of the District Court. However, I do not believe the record supports such findings and can only conclude that the District Court abused its discretion in preventing Emporia from exercising its lawful right to provide for the education of its own children.

By accepting the District Court's conclusion that Emporia's operation of its own schools would "impede the dismantling of the dual system," the Court necessarily implies that the result of the severance would be something less than unitary schools, and that segregated education would persist in some measure in the classrooms of the Greensville County area. The Court does not articulate the standard by which it reaches this conclusion, and its result far exceeds the contemplation of *Brown* v. *Board of Education,* 347 U. S. 483 (1954), and all succeeding cases, including *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971).

If the severance of the two systems were permitted to proceed, the assignment of children to schools would depend solely on their residence. County residents would attend county schools, and city residents would attend city schools. Assignment to schools would in no sense

depend on race. Such a geographic assignment pattern is prima facie consistent with the Equal Protection Clause. See *Spencer* v. *Kugler,* 326 F. Supp. 1235 (N. J. 1971), aff'd, 404 U. S. 1027 (1972).

However, where a school system has been operated on a segregated basis in the past, and where ostensibly neutral attendance zones or district lines are drawn where none have existed before, we do not close our eyes to the facts in favor of theory. In *Green* v. *County School Board,* 391 U. S. 430 (1968), the Court ruled that dual school systems must cease to exist in an objective sense as well as under the law. It was apparent that under the freedom-of-choice plan before the Court in *Green,* the mere elimination of mandatory segregation had provided no meaningful remedy. *Green* imposed on school boards the responsibility to "fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools." 391 U. S., at 442. That, I believe, is precisely what would result if Emporia were permitted to operate its own school system— schools neither Negro nor white, "but just schools." As separate systems, both Emporia and Greensville County would have a majority of Negro students, the former slightly more than half, the latter slightly more than two-thirds. In the words of the Court of Appeals, "[t]he Emporia city unit would not be a white island in an otherwise black county." 442 F. 2d, at 573. Moreover, the Negro majority in the remaining county system would only slightly exceed that of the entire county area including Emporia. It is undisputed that education would be conducted on a completely desegregated basis within the separate systems. Thus, the situation would in no sense be comparable to that where the creation of attendance zones within a single formerly segregated school system leaves an inordinate number

of one-race schools, such as were found in *Davis* v. *Board of School Comm'rs,* 402 U. S. 33 (1971). Rather than perpetuating a dual system, I believe the proposed arrangement would completely eliminate all traces of state-imposed segregation.

It is quite true that the racial ratios of the two school systems would differ, but the elimination of such disparities is not the mission of desegregation. We stated in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S., at 24:

> "If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole."

It can no more be said that racial balance is the norm to be sought, than it can be said that mere racial imbalance was the condition requiring a judicial remedy. The pointlessness of such a "racial balancing" approach is well illustrated by the facts of this case. The District Court and the petitioners have placed great emphasis on the estimated six-percent increase in the proportion of Negro students in the county schools that would result from Emporia's withdrawal. I do not see how a difference of one or two children per class [1] would even be noticed, let alone how it would render

---

[1] The record shows that the pupil-teacher ratio in the county schools is less than 25 to 1. Assuming some rough correspondence between this ratio and the size of classes, a 6% racial shift would represent a change in the racial identity of 1.5 students per class on the average.

a school part of a dual system. We have seen that the normal movement of populations could bring about such shifts in a relatively short period of time. Obsession with such minor statistical differences reflects the gravely mistaken view that a plan providing more consistent racial ratios is somehow more unitary than one which tolerates a lack of racial balance. Since the goal is to dismantle dual school systems rather than to reproduce in each classroom a microcosmic reflection of the racial proportions of a given geographical area, there is no basis for saying that a plan providing a uniform racial balance is more effective or constitutionally preferred. School authorities may wish to pursue that goal as a matter of policy, but we have made it plain that it is not constitutionally mandated. See *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S., at 16.

The Court disavows a "racial balancing" approach, and seeks to justify the District Court's ruling by relying on several additional factors thought to aggravate the effect of the racial disparity. The real significance of these additional factors is so negligible as to suggest that the racial imbalance itself may be what the Court finds most unacceptable.

First, the Court raises the specter of resegregation resulting from the operation of separate school systems in the county area, but on the record in this case this is, at best, highly speculative. The Court suggests two reasons why such an additional racial shift could be anticipated with the existence of a separate school system for Emporia: white students residing in the county might abandon the public schools in favor of private academies, and white students residing in the city might leave private schools and enroll in the city school.

In assessing these projections it is necessary to compare the nature of the proposed separate systems with

that of the court-ordered "pairing" system. Thus the first possibility, that white students from the county might enter private schools, assumes that white families would be more likely to withdraw their children from public schools that are 72% Negro than from those that are 66% Negro. At most, any such difference would be marginal, and in fact it seems highly improbable that there would be any difference at all. The second possibility postulated by the Court seems equally unlikely; it assumes that families from the city who had previously withdrawn their children from the public schools due to impending desegregation, would return their children to public schools having more Negro than white pupils.

The Court does not mention the possibility of some form of mass migration of white families into the city from the outlying county. Of course, when there are adjoining school districts differing in their racial compositions, it is always conceivable that the differences will be accentuated by the so-called "white flight" phenomenon. But that danger seems remote in a situation such as this where there is a predominantly Negro population throughout the entire area of concern.

Second, the Court attaches significance to the fact that the school buildings located in the county were formerly used as all-Negro schools and intimates that these facilities are of generally poorer quality than those in the city. But the District Court made no such finding of fact, and the record does not support the Court's suggestion on this point. Admittedly, some dissatisfaction was expressed with the sites of the elementary schools in the county, and only the city elementary school has an auditorium. However, all three elementary schools located in the county are more modern than any school building located in the city, and the county and city high school buildings are identical in every respect.

On a fair reading of the entire record, it can only be said that any differences between the educational facilities located in the city and those in the county are *de minimis*.

Finally, the Court states that the process of desegregation would be impeded by the "adverse psychological effect" that a separate city system would have on Negro students in the county. Here, again, the Court seeks to justify the District Court's discretionary action by reliance on a factor never considered by that court. More important, it surpasses the bounds of reason to equate the psychological impact of creating adjoining unitary school systems, both having Negro majorities, with the feelings of inferiority referred to in *Brown I* as engendered by a segregated school system. In *Brown I* the Court emphasized that the legal policy of separating children in schools solely according to their race inevitably generates a sense of inferiority. These observations were supported by common human experience and reinforced by psychological authority. Here the Court seeks to make a similar judgment in a setting where no child is accorded differing treatment on the basis of race. This wholly speculative observation by the Court is supported neither by common experience nor by scientific authority.

Even giving maximum rational weight to all of the factors mentioned by the Court, I cannot conclude that separate systems for Emporia and Greensville County would be anything less than fully unitary and nonracial. The foundation and superstructure of the dual system would be dissolved, and the result would not factually preserve the separation of races that existed in the past. We noted in *Swann* "that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." 402

U. S., at 26. This reflects our consistent emphasis on the elimination of the discriminatory *systems*, rather than on mere numbers in particular schools. The proposed systems here would retain no "one-race, or virtually one-race schools;" but more important, all vestiges of the discriminatory system would be removed. That is all the Constitution commands.

It is argued that even if Emporia's operation of its own unitary school system would have been constitutionally permissible, it was nevertheless within the equitable discretion of the District Court to insist on a "more effective" plan of desegregation in the form of a county-wide school system. In *Brown* v. *Board of Education,* 349 U. S. 294 (1955) (*Brown II*), the Court first conferred on the district courts the responsibility to enforce the desegregation of the schools, if school authorities failed to do so, according to equitable remedial principles. While we have emphasized the flexibility of the power of district courts in this process, the invocation of remedial jurisdiction is not equivalent to having a school district placed in receivership. It has been implicit in all of our decisions from *Brown II* to *Swann,* that if local authorities devise a plan that will effectively eliminate segregation in the schools, a district court must accept such a plan unless there are strong reasons why a different plan is to be preferred. A local school board plan that will eliminate dual schools, stop discrimination, and improve the quality of education ought not be cast aside because a judge can evolve some other plan that accomplishes the same result, or what he considers a preferable result, with a two percent, four percent, or six percent difference in racial composition. Such an approach gives controlling weight to sociological theories, not constitutional doctrine.

This limitation on the discretion of the district courts involves more than polite deference to the role of local

governments. Local control is not only vital to continued public support of the schools, but it is of overriding importance from an educational standpoint as well. The success of any school system depends on a vast range of factors that lie beyond the competence and power of the courts. Curricular decisions, the structuring of grade levels, the planning of extracurricular activities, to mention a few, are matters lying solely within the province of school officials, who maintain a day-to-day supervision that a judge cannot. A plan devised by school officials is apt to be attuned to these highly relevant educational goals; a plan deemed preferable in the abstract by a judge might well overlook and thus undermine these primary concerns.

The discretion of a district court is further limited where, as here, it deals with totally separate political entities. This is a very different case from one where a school board proposes attendance zones within a single school district or even one where a school district is newly formed within a county unit. Under Virginia law, Emporia is as independent from Greensville County as one State is from another. See *City of Richmond* v. *County Board,* 199 Va. 679, 684, 101 S. E. 2d 641, 644 (1958); *Murray* v. *City of Roanoke,* 192 Va. 321, 324, 64 S. E. 2d 804, 807 (1951). This may be an anomaly in municipal jurisprudence, but it is Virginia's anomaly; it is of ancient origin, and it is not forbidden by the Constitution. To bar the city of Emporia from operating its own school system is to strip it of its most important governmental responsibility, and thus largely to deny its existence as an independent governmental entity. It is a serious step and, absent the factors that persuade me to the contrary in *Scotland Neck,*[2] decided today, I am unwilling to go that far.

---

[2] *United States* v. *Scotland Neck City Board of Education* and *Cotton* v. *Scotland Neck City Board of Education, post,* p. 484.

Although the rights and powers of a bona fide political entity may not be used as a cloak for evasive action, neither can those powers be nullified by judicial intervention to achieve a unitary system in a particular way. When a plan devised by local authorities crosses the threshold of achieving actual desegregation, it is not for the district courts to overstep local prerogatives and insist on some other alternative. Judicial power ends when a dual school system has ceased to exist.

Since Emporia's operation of a separate school system would not compromise the goal of eliminating dual schools, there is no basis for requiring Emporia to demonstrate the necessity of its decision. The "heavy burden" test referred to in *Green* applies only where there is serious reason to doubt the efficacy of a school board's plan as a means of achieving desegregation, and there is no basis for such doubt here. Nonetheless, the Court's treatment of Emporia's reasons for establishing a separate system merits comment.

The Court makes light of Emporia's desire to create a high-quality, unitary school system for the children of its citizens. In so doing, the Court disregards the following explicit finding of the District Court:

> "The city clearly contemplates a superior quality educational program. It is anticipated that the cost will be such as to require higher tax payments by city residents. A kindergarten program, ungraded primary levels, health services, adult education, and a low pupil-teacher ratio are included in the plan . . . ." 309 F. Supp., at 674.

Furthermore, the Court suggests that if Emporia were in fact to provide the top-flight educational program the District Judge anticipated, it could only worsen the quality of education in the remaining county schools. To be sure, there was cause for concern over the relative quality of education offered in the county schools;

as the District Court observed, county officials did "not embrace the court-ordered unitary plan with enthusiasm." 309 F. Supp., at 680. The record shows that prior to the 1969–1970 school year, per-pupil expenditures in Greensville County lagged behind the state median, and that the increase in the county school budget for the 1969–1970 school year was insufficient to keep abreast of inflation, not to mention increased transportation costs. But the city of Emporia was in no position to alleviate this problem for the county. The county had previously refused to allow the city to participate in joint administration of the schools, and the city had absolutely no power to affect the level of funding for the county schools. Under the contract, Emporia was the purchaser of whatever educational services the county had to offer. Out of understandable concern for the quality of these services, it sought to alter the contractual arrangement in order to provide better unitary schools.

There is no basis on this record for assuming that the quality of education in the county schools was likely to suffer further due to Emporia's withdrawal. The Court relies on the District Court's finding that "the desire of the city leaders, coupled with their obvious leadership ability, is and will be an important facet in the successful operation of any court-ordered plan." 309 F. Supp., at 679. The District Court made this finding despite the fact that the county had refused to administer the schools jointly with the city, and despite uncontradicted evidence that there was no line of communications between the city and county governments, that the city government had been unable to get any cooperation from the county government, and that there was an atmosphere of active antagonism between the two governments. With all deference to the trier of fact, I cannot accept this finding as supported by evidence in the record of this case. It appears that the District Court wanted

that "obvious leadership ability" of Emporia's citizens to exert its influence on the more reluctant leadership in the county. This is a laudable goal in the abstract, but the courts must adjust their remedies to the facts of each case as they bear on the central problem of eliminating a dual system.

Although acknowledging Emporia's need to have some "[d]irect control over decisions vitally affecting the education of [its] children," the Court states that since Emporia found the contractual arrangement tolerable prior to 1969, it should not now be heard to complain. However, the city did not enter that contract of its own free choice. From the time Emporia became a city, consideration was given to the formation of a separate school system, and it was at least thought necessary that the city participate in administration of the county school system. After the county rejected the city's proposal for joint administration, the county threatened to terminate educational services for city children unless the city entered an agreement by April 30, 1968. Only then— under virtual duress—did the city submit to the contractual arrangement. It was not until June 1969 that the city was advised by its counsel that the agreement might be illegal. Steps were then taken to terminate the strained relationship.

Recognizing the tensions inherent in a contractual arrangement put together under these conditions, the Court indicates that Emporia might be permitted to operate a separate school system at some future time. The Court does not explain how the passage of time will substantially alter the situation that existed at the time the District Court entered its injunction. If, as the Court states, desegregation in the county was destined to fail if Emporia established its own school system in 1969, it is difficult to understand why it would not be an undue risk to allow separation in the future.

The more realistic view is that there was never such a danger, and that the District Court had no cause to disregard Emporia's desire to free itself from its ties to Greensville County. However, even on the Court's terms, I assume that Emporia could go back to the District Court tomorrow and renew its request to operate a separate system. The county-wide plan has been in effect for the past three years, and the city should now be relieved of the court-imposed duty to purchase whatever quality of education the county sees fit to provide.

Finally, some discussion is warranted of the relevance of discriminatory purpose in cases such as these. It is, of course, correct that "[t]he measure of any desegregation plan is its effectiveness," *Davis* v. *Board of School Comm'rs,* 402 U. S., at 37, and that a plan that stops short of dismantling a dual school system cannot be redeemed by benevolent motives. But it is also true that even where a dual system has in fact been dismantled, as it plainly has been in Emporia, we must still be alert to make sure that ostensibly nondiscriminatory actions are not designed to exclude children from schools because of their race. We are well aware that the progress of school desegregation since 1954 has been hampered by persistent resistance and evasion in many places. Thus, the normal judicial reluctance to probe the motives or purposes underlying official acts must yield to the realities in this very sensitive area of constitutional adjudication. Compare *Griffin* v. *County School Board of Prince Edward County,* 377 U. S. 218 (1964), with *Palmer* v. *Thompson,* 403 U. S. 217 (1971).

There is no basis for concluding, on this record, that Emporia's decision to operate a separate school system was the manifestation of a discriminatory purpose. The strongest finding made by the District Court was that race was "in a sense" a factor in the city's decision; read in context, this ambiguous finding does not relate to any

invidious consideration of race. The District Court relied solely on the following testimony of the chairman of the city school board:

> "Race, of course, affected the operation of the schools by the county, and I again say, I do not think, or we felt that the county was not capable of putting the monies in and the effort and the leadership into a system that would effectively make a unitary system work . . . ," 309 F. Supp., at 680.

I cannot view this kind of consideration of race as discriminatory or even objectionable. The same doubts about the county's commitment to the operation of a high-quality unitary system would have come into play even if the racial composition of Emporia were precisely the same as that of the entire county area, including Emporia.

Nor is this a case where we can presume a discriminatory purpose from an obviously discriminatory effect. Cf. *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). We are not confronted with an awkward gerrymander or striking shift in racial proportions. The modest difference between the racial composition of Emporia's proposed separate school system and that of the county as a whole affords no basis for an inference of racial motivation. And while it seems that the more cumbersome features of the District Court's plan hastened the city's inevitable decision to operate a separate unitary school system, this was not because of any desire to manipulate the racial balance of its schools.

Read as a whole, this record suggests that the District Court, acting before our decision in *Swann,* was reaching for some hypothetical perfection in racial balance, rather than the elimination of a dual school system. To put it in the simplest terms, the Court, in adopting the District Court's approach, goes too far.