**BOARD OF EDUCATION OF INDEPENDENT SCHOOL DISTRICT NUMBER 53 OF OKLAHOMA COUNTY, OKLAHOMA, a Public Body Corporate, Plaintiff-Appellant,**

v.

**BOARD OF EDUCATION OF INDEPENDENT SCHOOL DISTRICT NUMBER 52 OF OKLAHOMA COUNTY, OKLAHOMA, a Public Body Corporate, et al., Defendants-Appellees.**

No. 75–1337.

United States Court of Appeals, Tenth Circuit.

Argued Jan. 27, 1976.

Decided March 15, 1976.

Leslie L. Conner and James M. Little, of Conner, Little & Conner, Oklahoma City, Okl., for plaintiff-appellant.

Barney W. Miller, of Miller, Granger & Hamilton, Oklahoma City, Okl., for defendants-appellees.

Before McWILLIAMS, BREITENSTEIN and BARRETT, Circuit Judges.

BREITENSTEIN, Circuit Judge.

This civil rights action relating to the transfer of territory from one school district to another is before the court for the third time. We reversed Nos. 72–1094 and 73–1225 on procedural grounds. After the second remand the case was tried by another Judge. The controversy has twice been before the Oklahoma Supreme Court. See *Haller v. Austin,* Okl., 487 P.2d 1360, and *Austin v. State Board of Education,* Okl.,

497 P.2d 218. After an evidentiary hearing, the trial court made comprehensive findings of fact and entered judgment against the school district from which the territory had been taken. We affirm.

Plaintiff-appellant is Board of Education of Independent School District No. 53 of the Oklahoma County, Oklahoma (Crooked Oak District). The defendants-appellees are Board of Education of Independent School District No. 52 of Oklahoma County, Oklahoma (Midwest City District), Fisher and McDonald in their official capacities as Superintendent and Assistant Superintendent of Public Instruction for the State of Oklahoma, White in his official capacity as County Superintendent of Schools, and Parker and Austin as individuals. Upon petitions circulated by Parker and Austin and others an election was held pursuant to Oklahoma statutes which are not here attacked. The election favored the deannexation of the affected area from Crooked Oak and its annexation to Midwest. The election procedures were approved in *Haller*, 487 P.2d 1360, 1362. In *Austin v. State Board of Education*, 497 P.2d 218, 221, the Oklahoma school officials were "directed to proceed to perform their statutory duties and thereby so implement the annexation that it shall become full (sic.) effective on July 1, 1972." Crooked Oak brought suit under 42 U.S.C. § 1983 in federal court asserting an affirmative constitutional obligation to protect its integrated school district and the rights of the persons in its district.

In *Adickes v. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142, 150, the Supreme Court said that two elements are essential to recovery under § 1983. First, the plaintiff must prove deprivation of a right secured by the Constitution and laws of the United States. Second, plaintiff must show that defendant "acted under color of law." We consider the two elements in the order stated.

Before the transfer Crooked Oak district embraced about six square miles. It was bounded on the east by Midwest and on the other sides by the Oklahoma City School District. Until after the decision in *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, Crooked Oak operated segregated schools. At all times since its organization in 1942 Midwest has operated integrated schools.

In the fall of 1969 the City of Oklahoma City completed a low-income housing project, Hamilton Courts, within the boundaries of Crooked Oak. The Hamilton Courts tenants are predominately Black and the children are required to attend schools in Crooked Oak unless, upon application, a transfer is permitted to another district.

Crooked Oak operated one senior high school, one junior high school, and four elementary schools. One of the elementary schools, Southern Oak, was located adjacent to Hamilton Courts and in 1971 was identifiable as a Black school. In compliance with HEW guidelines Crooked Oak adopted an approved integration plan which was operative in the 1971–1972 school year. During that school year Crooked Oak had 3407 students of which 611 were Black and 198 were from other minorities.

As the result of the transfer Midwest received 1361 students from the affected area, of which 70 were Black. Before the transfer Crooked Oak had a Black enrollment of about 20% and this was increased to about 42% after the transfer.

Pursuant to petitions circulated by school patrons elections were held in 1959 and 1969 for the annexation of the affected area to Midwest. In each, annexation was defeated. A 1971 election approved the annexation. The Oklahoma law at that time did not require the approval of either district to the annexation. In 1972 the law was changed, 70 O.S.A. § 7–101, to require the consent of both the annexing and deannexed districts before an election could be held. Thereafter Crooked Oak tried unsuccessfully to get Midwest concurrence to a consolidation of the two districts. As a result of the voluntary failure of Crooked Oak to comply with HEW guidelines, Southern Oak elementary school was an identifiable Black school at the time of trial.

Crooked Oak alleged in its complaint that the transfer would cause it to lose a large portion of its tax base. The evidence is to the contrary. At the time of trial the tax base per pupil in Crooked Oak exceeded that in Midwest. The trial court found that the transfer has not affected "the money available to operate the Crooked Oak schools for the benefit of the students who remain in the district."

■ Crooked Oak asserts that the transfer of the affected area has resulted in the dismantling of an integrated system and, hence, violates the principles announced in *Wright v. Council of the City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51. In *Wright,* shortly after a district court desegregation decree a separate school system was carved out of a larger district to which the desegregation order applied. The court held that "establishment of a separate system would actually impede the process of dismantling the existing dual system." Ibid. at 466, 92 S.Ct. at 2205, 33 L.Ed.2d 64. The trial court in the case at bar found that Crooked Oak "was not racially identifiable as a Black school district either before or after the transfer." Also during the school year preceding the transfer Crooked Oak "operated a fully integrated school system." No problem exists with regard to the one senior and one junior high schools. The district court found that integration of the elementary schools "poses no problem which it [Crooked Oak] could not overcome had it the desire or motivation to do so." The transfer of the affected area did not dismantle an integrated system in Crooked Oak. Its system was integrated before and after the transfer, and is now fully capable of operation as an integrated system.

■ Crooked Oak says that the transfer caused it to alter its curriculum to eliminate certain college preparatory courses. It did this because of lack of demand and to adopt a curriculum best suited to its students. Evidence for Crooked Oak showed that the socio-economic levels of the students from its remaining territory was less than those in the affected area and had resulted in a drop in "educational percentile ratings." Curriculum changes and loss in ratings present no constitutional problems. There is no showing that any student who desired courses available in another district was denied a transfer. Crooked Oak has not established that either it, or any person living within its district, has lost any constitutional right by reason of the transfer.

■ The second element of § 1983 requires action under color of state law. The record shows that Midwest did nothing to accomplish the transfer of the affected area to its district. It did not seek or promote the transfer and under Oklahoma law it could not prevent it. Midwest took no action that would bring it within the purview of § 1983.

■ The state and county school officials had no part in the circulation of the transfer petitions nor in the election. The acts which they performed to carry out the result of the election were ministerial only and were not performed until after the Oklahoma Supreme Court ordered them to act. See *Austin,* 497 P.2d at 221. They did nothing to bring themselves within the purview of § 1983.

■ Defendants Austin and Parker, as individuals, circulated petitions for the transfer of the affected area to Midwest. In so doing they did not act jointly or in concert with the State of Oklahoma, with any of its officials or agents, or with Midwest. Austin and Parker did only what the Oklahoma statutes gave them a right to do as individuals. *Adickes* says, 398 U.S. at 152, 90 S.Ct. at 1606, 26 L.Ed.2d at 151, that one need not be a state officer to act under color of law and that it is enough if he " 'is a willful participant in joint activity with the State or its agents,' *United States v. Price,* 383 U.S. 787, 794, [86 S.Ct. 1152, 1157, 16 L.Ed.2d 267, 272]." In the instant case we have no compulsion or command by the state to discriminate. Resistance by state and county officials to the actions by Austin and Parker is shown by the fact that those officials twice took and lost appeals to the Supreme Court of Oklahoma and did not

act until that court ordered them to. See *Haller,* 487 P.2d at 1362, and *Austin,* 497 P.2d at 221. Austin and Parker utilized procedures authorized, but not compelled, by state law. In so doing they did not engage in any joint activity with either the state, its officials, or its agents. The § 1983 requirement of "color of law" has not been met.

Affirmed.