**UNITED STATES of America, Plaintiff,**

**and**

**Nellie Mae Webb, et al.,**
**Plaintiff-Intervenors,**

v.

**The SCHOOL DISTRICT OF OMAHA,**
**STATE OF NEBRASKA, et al.,**
**Defendants.**

**No. CV. 73–0–320.**

United States District Court,
D. Nebraska.

Nov. 29, 1983.

George Schneider, Dept. of Justice, Washington, D.C., for plaintiff.

Robert V. Broom, Omaha, Neb., for plaintiff-intervenors.

David M. Pedersen, Omaha, Neb., for defendants.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This matter came on for hearing and determination with reference to defendants' motion for court approval of changes in student assignments, school closings and construction in the School District of Omaha for the 1984–85 school year and beyond (Filing No. 369). Although plaintiff, the United States of America, filed a response to the defendants' motion stating that it has no objection to any of the proposed changes set out in said motion (Filing No. 378), plaintiff-intervenors, Nellie Mae Webb, et al., filed a response to the defendants' motion wherein they objected to certain aspects of said motion (Filing No. 388). Plaintiff-intervenors' principal objection, and the only objection raised at the hearing, is to the defendants' proposed closing of Technical Senior High School in 1984, and that issue was tried to the Court in August, 1983. This memorandum opinion will constitute the Court's findings of fact and conclusions of law as required by Fed. R.Civ.P. 52(a). After long and careful consideration of all the evidence adduced at trial, the arguments of counsel, the briefs of the parties, and the applicable law, the Court concludes that defendants' motion in its entirety must be granted for the reasons hereinafter stated.

### HISTORICAL BACKGROUND

This school case was filed by the United States of America on August 10, 1973. Certain black children attending the Omaha Public Schools and their parents, representing a class of all others similarly situated, were permitted to intervene as plaintiffs. The matter was tried to the Court in the spring of 1974 after which this Court found that the record did not substantiate a finding of intentional discrimination against minority students by practicing a deliberate policy of racial segregation. *United States v. School District of Omaha,* 389 F.Supp. 293 (D.Neb.1974). On appeal, the Court of Appeals for the Eighth Circuit reversed and remanded this case with directions "to take those steps necessary to bring about a thoroughly integrated school system" in accordance with specified guidelines outlined in the opinion. *United States v. School District of Omaha,* 521 F.2d 530 (8th Cir.1975).

Accordingly, this Court undertook to develop a remedial desegregation plan for the School District of Omaha. After extensive hearings, the Court adopted a plan that went into effect at the opening of the 1976–77 school year. *United States v. School District of Omaha,* 418 F.Supp. 22 (D.Neb. 1976). The plaintiff-intervenors appealed the district court's order and a cross-appeal was filed by the School District. The Court of Appeals affirmed the plan. *United States v. School District of Omaha,* 541 F.2d 708 (8th Cir.1976). The School District petitioned for a writ of certiorari and the petition was granted. The Supreme Court vacated and remanded the judgment of the Court of Appeals with directions that the case be reconsidered in light of three recent Supreme Court decisions. *School District of Omaha v. United States,* 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977). The Court of Appeals remanded the question concerning the scope of the remedy to this Court in *United States v. School District of Omaha,* 565 F.2d 127 (8th Cir.1977). This Court held hearings in December of 1978 to determine whether the remedy was commensurate with the previously delineated wrongs. After careful consideration, this Court found that the scope of the desegregation plan implemented to remedy the system-wide violations by the School District did not exceed the scope of those violations. *United States v. School District of Omaha,* CV. 73–0–320, Unpublished memorandum opinion (June 26, 1979).

The desegregation plan adopted in 1976 and reaffirmed in 1979 continues to operate

in full force today with noteworthy success. Pursuant to the Court of Appeals' order, this Court retains jurisdiction over the School District and continues to supervise the operation of the desegregation plan. It is within the framework of court supervision of the desegregation plan of the School District of Omaha that this present matter arises and to which the Court now directs its attention.

FINDINGS OF FACT

The Omaha School District operates eight senior high schools for grades ten, eleven and twelve. They are: Technical Senior High School, Central Senior High School, North Senior High School, Northwest Senior High School, South Senior High School, Bryan Senior High School, Burke Senior High School, and Benson Senior High School. Pursuant to the terms of the desegregation plan, the eight high schools were reorganized primarily on a voluntary plan. Feeder patterns were adjusted, modifications were made in the open enrollment policy, a magnet program for Technical High School was developed, and racial balance transfers were encouraged. As a result, the reorganization of the high schools to foster balanced racial composition in each school was achieved without mandatory busing. In particular, the black student enrollment at Technical Senior High School went from 81.5 per cent in 1975–76 to 34.1 per cent in 1982–83.

However, the School District's success in desegregating its high schools has not been matched with stable enrollments. In 1975–76 the enrollment at the eight senior high schools was 13,351 students. In 1982–83,

the enrollment in the eight senior high schools had dropped to 9,755. Further, it is projected that the enrollment will continue to drop and stabilize at approximately 8,800 students in 1984–85. (Tr. 134:7–17) (Exhibit 35). In response to enrollment decline, the School District, three years ago, set out to study the issue of school consolidation. (Exhibit 332). Former school superintendent Knutzen set up a thirty-eight member Citizens' Task Force on School Consolidation which reported to the Board of Education in April, 1981. On October 5, 1981, after reviewing the Citizens' Task Force report, the Board adopted eight "criteria and related practices" in identifying schools to be considered for consolidation.[1]

A new Superintendent, Dr. Jack Taylor, was hired in the summer of 1982 and he once again took up the issue of school consolidation and closings, in response to the problems of enrollment declines, underutilization of buildings, excessive space and high per pupil costs. Because he was new to the district, Dr. Taylor felt that he needed additional guidance before he took up the matter of school consolidations with the Board. Therefore, a "School and Community Task Force For Preparation and Evaluation of Racial Balance and School Consolidation Alternatives" was established by Dr. Taylor in September, 1982. It was composed of school employees, parents, community representatives and students. A total of thirty-two people served at one time or another. Ten members were black. The Task Force members were given numerous documents to analyze and study, among them, the desegregation plan

---

**1.** The "criteria and related practices" adopted by the School Board are as follows: (1) student educational opportunities are minimal; (2) enrollment is declining at a rate which exceeds the district-wide average by five per cent or more; (3) per pupil costs exceed the district-wide average by five per cent or more; (4) major operational costs to maintain a safe learning environment are required; (5) future enrollment trends are projected to continue downward because of population mobility; declining birthrates and community redevelopment; (6) student enrollment in a given building is below fifty per cent of its capacity; (7) students can be reassigned to nearby or adjacent school(s); (8) student reassignment can be accomplished with minimal cost to the district. Further, the Board agreed that criteria 7 and 8, and at least four of the remaining six must apply before school consolidation would be considered. In 1981, it was thought by the central school administrators that three of the first six criteria applied to Technical High School (Exhibit 332). In 1982, it was thought by the school administration that Technical Senior High School met at least five criteria of the first six criteria, namely numbers 2, 3, 4, 5 and 6 (Tr. 63:10–11) (Exhibit 30). These criteria were not used as dispositive indicators, but rather as "flags" or points for discussion and consideration (Tr. 62:4–24; 365:20–24).

and annual monitoring reports, enrollment figures and trends, racial composition figures, building capacity figures, census indicators and city maps, etc. In addition the Task Force members were given the eight criteria adopted by the Board of Education for the School District of Omaha in 1981 and the Task Force itself then developed eighteen of its own "primary consideration statements."[2]

The Task Force met nineteen times and then voted on the various alternatives that had been developed by its two subcommittees. The four alternatives pertaining to the high school level developed by the secondary subcommittee were: (1) close Technical Senior High School; (2) close Benson High School; (3) close North High School; or (4) move ninth graders up to the senior high schools and close five junior high schools. The Task Force vote on each of the alternatives was as follows:

| | | | |
|---|---|---|---|
| close Technical Senior High School | - Yes | 13 No | 9 |
| close Benson Senior High School | - Yes | 5 No | 17 |
| close North | - Yes | 4 No | 18 |
| move ninth graders | - Yes | 5 No | 14 |

Also, a Plan B, which was to close Technical but retain the vocational facilities at the Technical site was voted upon separately. Fifteen voted in favor of Plan B and five voted against Plan B. (Tr. 50:17–24). The votes of the Task Force were then communicated to the Superintendent by Associate Superintendent Norbert J. Schuerman, who chaired the Task Force.

Doctor Taylor studied the working papers and minutes of the Task Force, discussed the options and potential implications with Dr. Schuerman, considered the four high school alternatives and the votes of the Task Force members on each alternative. One additional factor considered by Dr. Taylor, but not an issue considered by the Task Force, was the feasibility of utilizing the site of the closed senior high school as an office for central administrative headquarters. The administrative offices of the School District of Omaha are housed at more than ten locations and centralizing those offices was a concern and goal for school administrators. The

2. The School and Community Task Force primary consideration statements are as follows:
1. Educational opportunities should be improved.
2. The social, psychological, emotional, and intellectual needs of the individual student must be considered in providing flexibility in the student's program or school choices.
3. High priority should be placed on the safety and security of all students.
4. Educational programs proven to be integrative should be considered.
5. Kindergarten and first grade students will not be mandatorily reassigned.
6. In the development of desegregation plan adjustments, consideration will be given to keeping the number of mandatory assignments as small as possible.
7. Racial balance is important and should be continued.
8. Voluntary integrative plans will be included in the consideration to alter or maintain present desegregation plan.
9. Voluntary Racial Balance policies should be continued.
10. Exemplary instructional programs which attract students on a voluntary basis to achieve racial balance within designated schools should be provided.
11. School closing and desegregation plan adjustment recommendations will consider economic factors.
12. If mandatory reassignments are recommended, present practice of reassigning total grades from specific attendance areas should be a priority.
13. Minimizing the number of different schools to which a student is assigned is a priority.
14. The task force will utilize board-approved criteria in identifying which schools should be considered for closing. However, the task force may also consider additional factors in making recommendations to close or not to close schools.
15. Ideas, needs and suggestions from the community will receive careful consideration.
16. Keeping bus rides within the shortest possible timeframe and distance will be considered.
17. Public acceptance will be solicited through the use of community and parent groups. Such groups should include civic, labor, professional and business leaders, the religious community and other interested parties.
18. Every attempt will be made to secure community support well in advance of implementing *any* changes in student assignment patterns or school closings.
(Exhibit 22.)

present facilities are inadequate and overcrowded.

Dr. Taylor followed the advice of the majority of the Task Force and selected the option of closing Technical Senior High School because of the following factors: (1) Technical High School's enrollment decline; (2) Technical had the fewest students of any senior high school; (3) Technical was the largest senior high school in the district; (4) Technical and Central are located closer together than any other senior high schools in the district; (5) the closing of Technical would achieve the maximum financial savings of any senior high school closing because of its high per pupil cost, the size of its building, and because of the large amount of money which could be saved from the scheduled major renovation of the Technical facility as a classroom building; (6) the closing of Technical would aid integration of North; and (7) Technical Senior High School would serve as an ideal location for a consolidated administrative headquarters because of its centralized location and large available space.

Dr. Taylor rejected the closure of North for the following reasons: the comparatively greater distance which students would have to travel to the next nearest senior high school if North were to close rather than Technical; North is a viable attendance area into the foreseeable future; the closure of North would affect more students than the closure of Technical; the closure of North would more seriously impact black youngsters than the closure of Technical; North is not centrally located.

Dr. Taylor rejected the closure of Benson Senior High for the following reasons: students would have to travel a greater distance to the next nearest senior high school if Benson were to close rather than if Technical were to close; Benson and Technical attendance areas are both integrated; Benson has a viable residential student population into the foreseeable future; the closure of Benson would affect the lives of more students than the closure of Technical; Benson is not a large enough facility to house all the anticipated needs for administrative space.

Dr. Taylor rejected the option of moving all ninth graders up to the senior high schools for the following reasons: this option would involve the closure of more facilities; this option would tax the enrollment capacities for senior high schools; it would disrupt more lives than the closure of Technical; any such option would substantially alter a school desegregation plan that was and is working well; some of the junior high schools scheduled for closing with such an option have facilities which are utilized by the senior high schools; no junior high school building is large enough to house a centralized administrative headquarters.

On February 23, 1983, Dr. Taylor presented a written report (Exhibit 41) to the Board of Education which contained his proposed three-year plan for the School District. The specific senior high recommendations for 1984–85 were as follows:

1) Technical High School—Reassign students and renovate for central office facility.

2) Benson High—Add students from Kennedy attendance area (106).

3) Bryan Senior High—Will become a four-year (9–12) high school. Add ninth grade from Indian Hills, Highland, Chandlerview, Corrigan, Southern Ashland Park, Guilder and Pawnee (270). Add students (10–12) from Corrigan area which formerly attended South (154).

4) Burke High—No change.

5) Central High—Technical-Central area becomes Central attendance area. Reassign Kennedy area students to Benson (106).

6) North High—Initiate an academic and comprehensive computer-math magnet to attract non-black students. Provide transportation for Ponca area students to attend North High.

7) Northwest High—No change.

8) South High—Initiate a comprehensive computer-math magnet to attract black students. Initiate telecommunications and photography magnet to attract black

students (at Technical High facility). Will become a four-year (9–12) high school. Add ninth grade from western portion of Rosewater, Vinton, Spring Lake, Robbins, Ashland Park, Marrs, Riverview, and eastern sector of Chandler View (199). Reassign tenth, eleventh and twelfth grades from Corrigan to Bryan Senior (150).

The proposals for school closings were presented to the Board of Education as one package for approval or disapproval. Dr. Taylor did this so as to minimize disruption in the community and because of the interrelated nature of the proposed closings at the elementary, junior high and senior high levels (Tr. 203:10–25; 204:1–5). The plan also proposed the closing of twelve elementary schools all in predominantly white residential areas and three junior high schools, one in a predominantly white residential area, one in an integrated area, and one in a predominantly black area. The junior high school which is to close in the predominantly black area will be utilized as a grade 4–6 science magnet. The other junior highs will be utilized as elementary schools. Two new elementary schools in predominantly white areas will be built. These other components of the plan were not objected to by the plaintiff-intervenors and are not, therefore, issues before this Court and are not addressed herein.

The Superintendent asked the Board to wait approximately six weeks between his presentation of his plan and its formal decision so that the school administrators could hold community meetings concerning the plan. The Board consented to wait and informal community meetings were held. Also, the Board conducted two full open Board meetings for public reaction to the plan. Numerous citizens expressed their personal views in favor of and in opposition to the plan. Many spoke against the closing of Technical Senior High. Two Board members, Warren and McGruder, tried to get the Board to consider the plan but

eliminate the closing of Technical from the recommendations. That amendment failed by a Board vote of 10 to 2. On April 4, 1983, after due deliberation, the Board of Education adopted the plan of the Superintendent of Schools by a vote of 9 to 3 (Exhibit 42). Board members Warren and McGruder, the only two black members of the Board, voted against the plan because of their concern over the closing of Technical Senior High School. Board member Haller voted against the plan because of his concern over the closing of several elementary schools in south Omaha within the district he represented.

On April 11, 1983, the School District filed a motion to amend the U.S. District Court's desegregation plan for the School District of Omaha for the 1983–84 school year (Filing No. 368), as well as the motion for court approval of the changes in student assignments, school closings and construction in the School District of Omaha for the 1984–85 school year and beyond (Filing No. 369). On June 10, 1983, the plaintiff, United States, filed a written response to both motions stating that it had reviewed each of the elements of the motions and it had no objection to the granting of the motions in their entirety (Filing Nos. 378, 379). On June 13, 1983, the plaintiff-intervenors and the defendant School District of Omaha stipulated and agreed to the motion to amend United States District Court desegregation plan for the School District of Omaha for the 1983–84 school year (Filing No. 385) and the Court ordered that said motion be granted upon the terms of the stipulation with a single word substitution (Filing No. 386) on June 16, 1983. Thereafter, on June 30, 1983, the plaintiff-intervenors filed their response to defendants' motion regarding the 1984–85 school year and beyond (Filing No. 388). Plaintiff-intervenors' central objection was to the proposed closing of Technical Senior High School.[3]

---

**3.** In its written response, the plaintiff-intervenors also objected to the School District's plan to develop computer-math magnets for grades 4–9, but the plaintiff-intervenors focused on the

Technical closing at the August hearing and they adduced no evidence whatever in regard to any matter other than Technical High.

The basis of the plaintiff-intervenors' objections are as follows:

1) The defendants' decision to close Technical Senior High School is based on factors which are the direct result of the School District's past unconstitutional segregative policies and practices regarding Technical Senior High School, as well as its unconstitutional and illegal construction of other high schools and further is a result of the School District's failure to properly implement and maintain the school desegregation plan adopted by this Court in 1976, particularly with respect to remedying the unconstitutional segregative practices at Technical Senior High School.

2) The closing of Technical Senior High School will impose additional and unnecessary burdens of integration on black students.

3) The closing of Technical Senior High School in the historical context of this case would permit and allow vestiges of unconstitutional segregation to remain.

4) The defendants have failed to adequately consider alternatives which would not require closing Technical Senior High School.

To provide a framework upon which to analyze and consider the plaintiff-intervenors' objections, it is necessary and helpful to review the history of Technical Senior High School as it pertains to this lawsuit.

When the United States Court of Appeals for the Eighth Circuit found that the School District of Omaha had committed unconstitutional segregative violations, one of the five major areas identified was the conduct of the School District that led to the deterioration of Technical Senior High School. Technical Senior High School had gone from the largest high school in the city having a predominantly white student body to a "virtually all black and relatively empty school." *United States v. School District of Omaha, supra,* 521 F.2d at 546. The areas of concern mentioned by the Court of Appeals were the School District's failure to provide Technical with its own attendance zone, the building of additions and new schools in adjacent white areas during a time when Technical Senior High had sufficient space to accommodate those students with boundary adjustments, the assignment of a disproportionate number of special education and problem students to Technical Senior High, and the refusal to assign white students to Technical Senior High School based on perceived opposition by the white community, which in turn was based on racial prejudice. 521 F.2d 544–45.

As previously referred to, the desegregation plan at the high school level was essentially a voluntary plan. The components of the plan that specifically related to Technical Senior High School were as follows:

1) Black enrollment at Technical Senior High School would not be permitted to exceed court guidelines;

2) All non-black students could voluntarily transfer to Technical;

3) Full-time enrollment for black students at Technical was limited to black students living within the Central-Technical attendance area;

4) Black students from Technical could voluntarily transfer to Bryan, Burke, Northwest or South; and

5) A part-time magnet program would be maintained at Technical. (Exhibit 302).

As part of its magnet program, Technical Senior High School developed and expanded the special individualized curriculum in which students progressed at their own pace while carefully monitored by teachers and special counselors known as group guides. In addition, specialized courses in radio, television, photography and nurse and dental assisting were made available to students across the district on a space-available part-time basis.

In 1975, Technical Senior High began an intensive recruitment program designed to attract junior high students. Because it shared its attendance zone with Central High School, Technical Senior High like Central did not have any mandatorily assigned students and therefore relied heavily on recruiting efforts. Technical Senior High School's staff members conducted counselor visitation, workshops at the high

school, and assembly programs in the junior high schools. The following year, mini-magnets were established at North High School, Benson High School and Central High School, and those high schools joined Technical in establishing recruiting programs. As a result of more high schools planning recruiting activities, the junior high school administrators began to complain that the ninth grade students were losing too much classroom time for recruitment purposes (Tr. 122:19–22; 567:6–17; 499:1–10). In response to the concerns of the junior high school principals, the central school administrators eliminated the assembly programs for all high schools. Also at that time Technical was asked to not recruit students who were eligible to attend North High School and in some instances not to recruit students eligible to attend Benson High School for racial balance purposes (Tr. 568:1–11; 585:8–16).

Between 1975 and 1977 recruitment and desegregation efforts were successful, especially at Technical Senior High. Total enrollment at Technical grew to over 1,500 and white student enrollment increased to approximately 60 per cent. In September, 1978, Technical Senior High School enrollment peaked at 1,531, and that fall approximately 200 students were asked to take their second choice for high school because it was felt by the Technical Senior High

4. The actual capacity of Technical Senior High School is disputed by the parties. The School District states that the capacity at Technical Senior High is approximately 2,246 (Exhibit 8). This figure is derived by adding the full-time program capacity number which is 1,200 to the magnet program capacity number, which is 1,046 (Exhibit 49). The plaintiff-intervenors contend that the capacity at Technical Senior High is 1,200 students, which is the optimal number of students in the individualized curriculum. Apparently the central administration and the Technical Senior High School staff never reached an agreement on this issue (Tr. 161:2–5). The significance of this point is that if the larger number is utilized, Technical Senior High School in 1982 was below fifty per cent capacity and if the smaller capacity number is used, Technical Senior High was above fifty per cent capacity in 1982.

5. The loss of students at each of the senior high schools since 1978–79 is as follows:

staff that 1,500 was the maximum program capacity given the individualized curriculum.[4] Then because the 1978–79 enrollment was so large, it was decided that intensive recruitment efforts were not needed as much as before (Bradley deposition 11:18–22; Tr. 370:19–23; 403:15–23; 404:1–7). Lesser recruiting efforts were made during the 1978–79 and 1979–80 school years. As Technical enrollment figures began to decline, the school staff reinstated a recruitment program in 1980–81, but on a limited basis with a few workshops. In 1981–82, the school launched its most extensive workshop recruitment effort with more than twenty workshops being presented (Exhibit 327).

Despite these efforts, Technical Senior High School enrollment continued to decline. In the last five years, Technical Senior High has had the most severe enrollment loss of any of the senior high schools.[5] From its peak enrollment in 1978 of 1531 students, it has dropped to 856 students in 1982. In addition, pre-registration statistics suggest that the enrollment at Technical Senior High School for the fall of 1983 would be below 800.

In 1982, Technical Senior High School had the lowest enrollment of the eight senior high schools in the School District.[6] It also had the largest amount of educational

| SCHOOL | TOTAL # | % LOSS |
|---|---|---|
| Benson | −164 | −13.8% |
| Bryan | −248 | −20.3% |
| Burke | −334 | −17.6% |
| Central | + 73 | + 5.1% |
| North | −293 | −21.8% |
| Northwest | −207 | −12.6% |
| South | −276 | −16.9% |
| Technical | −675 | −44.1% |
| Total | −2,124 | −17.9% |

6. The 1982–83 enrollments at the high schools were as follows:

| | |
|---|---|
| Benson | 1,023 |
| Bryan | 971 |
| Burke | 1,566 |
| Central | 1,500 |
| North | 1,048 |
| Northwest | 1,431 |
| South | 1,360 |
| Technical | 856 |

space,[7] and the highest average cost per pupil.[8] In addition, projected costs for future renovation if the Technical building were to remain an educational facility were almost $5 million (Exhibit 47). It was within this factual context that the School District decided that Technical Senior High School was the most reasonable choice for the one senior high school to close in 1984.

## DISCUSSION

This Court is charged with the duty of supervising the desegregation plan for the School District of Omaha until a unitary system of education is established. As part of that continuing responsibility, this Court is now being asked to review a decision of the School Superintendent and the School Board to close a senior high school and thereby change the desegregation plan. The Court is not being asked to substitute its judgment for that of the School District, nor will it do so. In fact, the Court is bound to approve a plan that effectively eliminates segregation in the schools unless there are strong reasons why a different plan is to be preferred. *Wright v. Council of City of Emporia*, 407 U.S. 451, 477, 92 S.Ct. 2196, 2210, 33 L.Ed.2d 51 (1972) (Burger, C.J., dissenting). The plaintiff in this case, the United States of America, has already approved all the plan changes proposed by the defendant School District. It is only the plaintiff-intervenors who object to the high school closing. In this context, this Court's inquiry is a limited one and it must adhere to the guidelines established by the appellate courts.

Courts have considered various factors when determining whether an integration plan involving a school closing violates constitutional and statutory safeguards. The Tenth Circuit Court of Appeals has noted that the following factors should be evaluated in such cases:

(1) the existence of valid nonracial educational reasons for closing school facilities located in predominantly black areas; (2) the condition and adequacy of the facilities at the school being closed; (3) whether the facilities to which the minority students were being transferred were adequate and whether the transfer would cause those facilities to be "overtaxed"; (4) whether the primary or sole reason for the school board's action was the fear that less constitutionally suspect solutions to segregation would lead to "white flight" from the school district; (5) whether the entire or primary burden of integration is placed on black students and teachers; and (6) whether the school board considered alternatives which did not require the closure of predominantly black schools before making a final decision.

*Fitzpatrick v. Board of Education, City of Enid Public Schools*, 578 F.2d 858, 861 (10th Cir.1978) (citations omitted).

Two other circuits have approved the *Fitzpatrick* standards. *Mitchell v. McCunney*, 651 F.2d 183, 188 (3d Cir.1981); *Davis v. Board of Education of North Little Rock*, 674 F.2d 684, 687–88 (8th Cir. 1982). Particularly important is the Eighth Circuit Court of Appeals' opinion in *Davis* which provides concrete guidance in the instant matter.

In *Davis*, the Board of Education of a North Little Rock School District sought permission from the district court to revise the desegregation plan. The Board wished

---

7. The educational space at the eight senior high schools is as follows:

| | |
|---|---|
| Benson | 105,070 square feet |
| Bryan | 117,569 |
| Burke | 140,194 |
| Central | 141,576 |
| North | 120,707 |
| Northwest | 121,643 |
| South | 156,908 |
| Technical | 227,785 |

8. The average cost per pupil of staff, operations and maintenance at each of the senior high schools for the 1982–83 school year is as follows:

| | |
|---|---|
| Benson | $1,881.51 |
| Bryan | 1,935.95 |
| Burke | 1,782.54 |
| Central | 1,719.02 |
| North | 2,047.10 |
| Northwest | 1,856.35 |
| South | 1,859.87 |
| Technical | 2,783.95 |

to close one of its schools in order to ease administrative problems caused by declining enrollment and decreased funding. The motion was opposed by intervenor-plaintiff on the grounds that it would place a disproportionate transportation burden on black students and because it would mean the closing of the only junior high in a black neighborhood. The District Court, 520 F.Supp. 108 (1981), approved the proposed closing and the Eighth Circuit affirmed that decision. *Davis, supra,* 674 F.2d at 684.

In reaching its conclusion, the *Davis* court applied the *Fitzpatrick* factors to the matter and added a seventh factor to be considered. The Eighth Circuit expanded the list of factors by adding that economic considerations as well as educational reasons should be evaluated. 674 F.2d at 688. The *Davis* court did, however, qualify the seventh factor by noting that financial considerations could not be dispositive. This caveat is also reflected in the *Fitzpatrick* case in which the Tenth Circuit wrote: "[N]o one of these factors, standing alone, is necessarily determinative." 578 F.2d at 862.

■ Also helpful to this Court is the governing standard set out in *Davis,* which placed the burden of proof on the School District to present competent evidence to support its motion to amend the desegregation plan. *Id.; see also, Haney v. County Board of Education,* 429 F.2d 364, 371 (8th Cir.1970). This Court agrees with the *Davis* court that the standard to be applied in such cases is as follows: "In school districts where a finding of de jure discrimination has been made and a desegregation plan is in effect the burden is upon the district to demonstrate that the motivation for the school closing is not racial .... This should be done through the use of objective evidence to show the need for the proposed closing, whatever other alternatives were considered and why they were rejected." 674 F.2d at 688.

Initially, the Court must consider whether there exist valid non-racial educational reasons for closing Technical Senior High School. It is undisputed that the present enrollment figures and the future projections establish the need for closing school district facilities at the secondary level in the School District of Omaha. High school enrollment has declined 26.9 per cent in the last eight school years, and the decision to close one of the eight senior high schools is a valid, non-racial response to the problem. The Court agrees that closing a school is responsive to the problem of declining enrollments. The selection of Technical Senior High School as the school to close is likewise based on educational, and other, factors that appear to this Court to have nothing whatsoever to do with race. There is no evidence that impermissible racially-segregative attitudes in any way motivated the deliberations of the Task Force or the Superintendent or the School Board. On the other hand, what is repeatedly reflected in the record of this instant matter is concern for maintaining racial balance in the schools and for achieving and maintaining a unitary system of education.

Technical Senior High School is now a predominantly white school located in a residentially integrated neighborhood which shares its attendance zone with nearby (1.6 miles) Central High School. The Technical Senior High facility has the largest amount of educational space and the fewest number of students attending. Also, because of its size and central location, it is a logical senior high school to close from the perspective of utilizing a closed senior high school as a centralized office for school administration. The Court finds these to be sound, non-racial reasons for selecting Technical Senior High School to close.

The plaintiff-intervenors contend that the School District is responsible for the enrollment decline at Technical Senior High School because it had placed some restrictions on Technical's recruiting efforts. Those restrictions involve contacts with junior high students that were in the North High attendance zone and in some instances students in the Benson zone. The Court finds that this contention is not warranted

in light of the record. The Court finds the School District had valid non-racial reasons for curtailing the Technical Senior High School recruiting in the late 1970's. The School District was responding to serious concerns of the junior high school principals and to the troubling trend toward racial imbalance at the other high schools, especially North Senior High. Three other factors buttress the Court's findings in this regard. Dr. Schuerman testified that the restrictions did not have the effect of lowering the number of white students that Technical traditionally drew from those restricted areas (Tr. 128:3–15; 585:8–16). Secondly, Mr. Eisenhardt, chairman of the Technical recruiting committee in 1981, testified that both Dr. Taylor and the former Superintendent complied with all the requests of the Technical recruiting committee (Tr. 497:5–22). Last, Technical's own staff decided to limit its recruiting efforts after the peak enrollment in 1978 (Bradley deposition 11:18–22; Tr. 370:19–23).

This Court is not unmindful of the role Technical Senior High School has played in this lawsuit or in this city. But Technical Senior High School's prior (and partial) history as a predominantly black school does not make this a "black school" closing case. See Davis, supra, 674 F.2d at 688; Fitzpatrick, supra, 578 F.2d at 862. Technical Senior High School is no longer the black high school of Omaha, and the fact that some members of the black community perceive a negative "message" from the School District's plan to close Technical High School cannot by itself nullify a nondiscriminatory desegregation plan. In Wright v. Council of City of Emporia, 407 U.S. 451, 461, 92 S.Ct. 2196, 2202–2203, 33 L.Ed.2d 51 (1972), a case relied upon by the plaintiff-intervenors, the Supreme Court considered the possible impact on the actual school children involved, not the possible perception by the community-at-large, Id. at 465–66, 92 S.Ct. at 2204–2205. The distinction is noteworthy. Even if Technical Senior High School had remained a racially identifiable school, a concept with which this Court does not agree, nor does the record support, it nevertheless should not remain open simply because a community asserts strong ties to it or students possess an affinity for it. See Mitchell, supra, 651 F.2d at 188, citing Arvizu v. Waco Independent School District, 495 F.2d 499, 504 (5th Cir.1974). The fact is that twice as many white students as black students will be affected by the closing of Technical Senior High School and the School District has valid non-racial reasons for asking all those students to change to one of the other seven high schools in 1984.

The second Fitzpatrick factor deals with the condition and adequacy of the facilities to be closed. Technical Senior High School is the largest and one of the oldest high school buildings in the School District. It was built in 1923 and its last major renovation was in 1972. It is scheduled for major capital expenditures in the near future. The only other high school built before Technical is Central High School which recently underwent extensive and expensive renovation. There is no evidence in the record that Technical Senior High School is inadequate as an educational facility. In fact, Technical Senior High School is known to have some fine vocational facilities, many of which will remain open at the Technical site and be available to students through the South High School program. It is not that Technical is inadequate as a vocational facility that makes it a reasonable selection for closing. Rather, it is its underutilization as an educational facility that makes it so. Additionally, it should be noted that its size makes it suitable to serve as central offices for the school administration.

The third factor suggested by the Fitzpatrick court requires a consideration of the facility which the displaced students would attend. In the context of this case, this assessment is more difficult because the displaced Technical students would not be transferred or assigned to one single school. This is so because the desegregation plan operates primarily on a voluntary basis at the secondary level and depending upon where the former Technical student resides, a number of options may be availa-

ble to him or her. However, any former Technical student who resides in the Technical-Central attendance zone will be permitted to attend Central High School if they choose to, and therefore, a consideration of that facility is relevant.

Central High School is approximately 1.6 miles away from Technical High School. It is the only senior high school in the district to increase in enrollment in the last five years. It has been recently renovated completely as a senior high school at the cost of approximately $10 million. It has been an integrated senior high school with at least ten per cent black enrollment since 1945–46. In 1982 Central High School's enrollment was 1,500 with a 28.8 per cent black student population. It is located in downtown Omaha and is accessible from all portions of the School District.

Given the recent major renovation at Central High School and its reputation for integrated academic excellence, the Court has no doubt that the facility is an adequate and attractive alternative for the displaced Technical students. Further, students opting to continue a curriculum of individualized study currently in place at Technical may continue in that program at South High School if they are black and at North High School if they are white. There is no evidence in the record to suggest that either facility is inadequate to accommodate the additional students. The fact that the individualized program is being placed in a traditional high school may present some problems at first, but this Court does not find that such a possibility warrants rejection of the plan. The placement of the individualized programs at those other high schools was aimed at increasing the black student enrollment at South High School and the white student enrollment at North High School which the Court finds to be permissible. Because the present Technical student body will likely disperse and attend a number of other high schools, it is doubtful that any one facility will be "overtaxed," especially since all are under capacity because of the district-wide enrollment decline.

The fourth factor listed by the *Fitzpatrick* court is whether the primary reason for the School District's action was in response to the fear that other solutions would lead to "white flight" from the School District. There is no evidence whatever that fear of "white flight" in any way motivated the School District's decision, and therefore the Court finds this factor inapplicable to the circumstances of this case.

■ The fifth factor to be considered is whether the primary burden is placed on black students and teachers by the proposed closing of Technical Senior High School. It is well established that the burden of desegregation should be shared as equally as possible between blacks and whites. *Davis, supra,* 674 F.2d at 687. The plan to close Technical Senior High School does not place the primary burden of integration upon black students. Since there are twice as many white students at Technical than there are black students, more whites are being immediately impacted than black students. Because Technical and Central are located so close together, black students residing in that zone may attend Central without traveling a significant additional distance.

In addition, if the issue of burdens is looked at from the perspective that one high school must close, the selection of Technical impacts the lives of fewer blacks than if either Central, North or Northwest were to close. And if based on pre-registration figures for 1983–84, the closing of Technical would affect fewer black students than if Benson, Central, North or Northwest were to close.

Plaintiff-intervenors argue that as a result of the closing of Technical Senior High School, black students will have additional burdens because those black students who want a vocational education will have to transfer out of their attendance zone. It is accurate to say that some black former Technical vocational students will have to travel to South High to continue in that type of program, but it is not the case that only black students will have that burden.

Any white student wanting vocational training that is available through South High will also be asked to travel outside his or her attendance zone. The important fact is that there is no concrete evidence that the School District has placed the primary burden of integration on the black student by closing Technical Senior High School. Plaintiff-intervenors argue that closing Technical will have a disproportionate effect on black high school students in terms of transportation but fail to demonstrate with non-hypothetical facts how this is so. Furthermore, a review of all the proposed plan changes demonstrates that at the elementary level, only predominantly white schools will close. Therefore, even if any imbalance of burdens did occur at the high school level, that unevenness may be counteracted at the elementary level. *See, e.g., Allen v. Asheville City Board of Education,* 434 F.2d 902, 907 (4th Cir.1970).

The sixth factor identified by the *Fitzpatrick* court is whether the School District considered alternatives which did not require the closing of Technical Senior High School before making the final decision. As set out in the factual findings, the Task Force and the Superintendent thoroughly considered the options of closing Benson, closing North and moving ninth graders into the high schools and thereby resulting in the closing of five or more junior high schools. The Court finds that the reasons stated for rejecting those options were reasonable and more importantly, not discriminatory in intent and effect. The School Board, because it was asked to consider the plan as a whole, did not actually vote on other alternatives, but that does not mean they did not consider the other alternatives. In fact, two members of the Board tried to get the Board to approve the plan but eliminate the recommendation to close Technical Senior High. This was rejected by a 10 to 2 vote of the Board. Secondly, and more importantly, there is evidence in the record that at the open Board meetings, a proponent of the close Benson alternative

presented his ideas to the Board (Tr. 415:22–25; 416:1–5) (Exhibit 320). In sum, the Court finds that there exists substantial evidence in the record that alternatives to closing Technical Senior High School were seriously considered by the School District and rejected for non-racial reasons.

The last factor to be considered was identified by the Eighth Circuit in *Davis,* and involves the economic considerations. The School District of Omaha is currently under state statutory budget limitations which prohibit an increase in its budget from state and local sources any greater than seven per cent (Exhibit 45). Quite naturally, financial considerations are important in the decision-making process of the School District, but not dispositive (Tr. 238:10–24). Closing one of the eight senior high schools will result in substantial cost savings in salaries, utilities and maintenance costs. Closing Technical Senior High School has the potential to achieve such savings. Technical Senior High School has the highest per pupil costs and the projected capital expenditures, which would no longer be necessary to undertake, were the highest of all the senior high schools. If Technical Senior High is utilized as a central office for school administration, the School District plans to immediately move operations contained in eight buildings to the Technical High School site.[9] The resulting financial savings from consolidating the school administrative offices would be substantial over time, although the Court is aware that the estimated cost of converting the Technical building into central offices is also substantial (Exhibit 46). In sum, the Court finds that the School District had valid economic reasons to consider closing Technical Senior High School and prudently took the economic factors into account.

▇ Evaluating all of these factors and not considering any single one to be dispositive, the Court finds that the School District has met its burden of proving that

9. The eight buildings are: (1) the Joslyn Castle, (2) Area Education Service Building, (3) South Annex, (4) West IMC, (5) Library Processing and School House Planning, (6) Saunders Professional Library-Intermediate Storage, (7) Springlake Media Center, (8) Vinton ROTC.

neutral and valid educational criteria motivated the decision to close Technical Senior High School. The School District amply demonstrated the need for closing a senior high school, considered various options, and rejected all of them but the closing of Technical Senior High School. The Court finds the reasons were nondiscriminatory and non-racial.

The Court appreciates and is well aware of the fact that school closings, as here, are always painful. But they are often required. So long as the method or formula used to accomplish this closing is developed in good faith and in the absence of record evidence that desegregation would be impaired, it must be approved. It would appear that the Omaha school desegregation plan, to date, has one controlling virtue found in few court-ordered school operations—it has worked. According to the evidence here, the annual monitoring reports, the statements and arguments of counsel and the judicial notice taken by this Court, it has worked well. It is the fervent hope of this Court that it will continue to do so.

■ We are faced with the sole question of whether the School District may validly close a high school and thereby amend the desegregation plan under which this community has been operating for the last seven years. The critical test, simply stated, is that unless the Court finds that this closing is made at a constitutionally impermissible sacrifice and deprivation on the part of black school children and parents, the law does not allow or require court interference. If the closing of Technical Senior High School can be demonstrated to be supportable on non-racial reasons, the Court is free to determine that the School District is justified in closing Technical Senior High School as a matter of sound educational judgment. *Bell v. West Point Municipal Separate School District, et al.,* 446 F.2d 1362, 1364 (5th Cir.1971) (Clark, J., concurring). The question here is not whether the Court might have selected a different school or schools for closing, but is instead whether the decision of the

School District amounts to invidious discrimination and a violation of the equal protection clause of the Fourteenth Amendment. *Allen, supra,* 434 F.2d at 905.

The plaintiff, United States of America, found no discrimination in the proposed plan and this Court is unable to perceive any invidious discrimination in the planned closing of Technical Senior High School either. This is not a case like *Brice v. Landis,* 314 F.Supp. 974 (N.D.Cal.1969), where a ninety-nine per cent black school is closed, and one-way busing of its black student body is the result. The record here clearly indicates that the decision of the School District was not animated by a desire to place a heavier desegregation burden on the black students nor does it have that effect. There is simply no basis whatsoever to conclude that the plan in question was the manifestation of a discriminatory purpose or any other impermissible racial consideration, especially when the entire plan is studied as a whole.

■ The Omaha school authorities carefully considered the matter and decided for valid non-racial reasons to close Technical Senior High School in 1984. The School District has met its burden as set out in *Davis.* Policy decisions made by local school officials must be accommodated unless they jeopardize the Court's mission to bring the system into compliance with the constitutional standards. *Morgan v. McDonough, et al.,* 689 F.2d 265, 275 (1st Cir.1982). The goal of achieving a fair and reasonably unburdensome desegregation plan does not oblige a school district to maintain half-filled schools and on this occasion, the Court finds that it must defer to the local authorities' interests and expertise in managing their own affairs. As the remedial phase winds down in this case, this Court recognizes the right of the School District to pursue educational goals and policies of its own choosing. *Id.* In sum, the Court concludes that the closing of Technical Senior High School is a reasonable part of an ongoing and workable plan of desegregation and is directed at achieving and maintaining a unitary system

**1412**

of education in the School District of Omaha, the ultimate goal of this decade-long lawsuit.

Accordingly, the defendants' motion for court approval of changes in student assignments, school closings and construction in the School District of Omaha for the 1984–85 school year and beyond (Filing No. 369) should be and the same is granted in its entirety. A separate order shall be entered this date in accordance with this memorandum opinion.